**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

_____
)
SPACE EXPLORATION )
TECHNOLOGIES CORP., )
                    Plaintiff, )
          v. )                    No. 14-354 C
)                    (Judge Braden)
THE UNITED STATES, )
                    Defendant, )
          and )
)
UNITED LAUNCH SERVICES, )
LLC, )
          Defendant-Intervenor. )
_____ )

**DEFENDANT'S MOTION TO DISMISS PORTIONS OF**
**PLAINTIFF'S COMPLAINT RELATED TO CONTRACT NO. FA8811-13-C-0003**

STUART F. DELERY
Assistant Attorney General

ROBERT KIRSCHMAN
Director

KIRK T. MANHARDT
Assistant Director

OF COUNSEL:

JEFFREY P. HILDEBRANT
Trial Attorney
Federal Courts Branch
U.S. Air Force Commercial Law
  and Litigation Directorate

ALEXANDER V. SVERDLOV
MATTHEW ANDRADE
DEVIN WOLAK
Trial Attorneys
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
PO Box 480
Ben Franklin Station
Washington, DC 20044
Tele: (202) 307-5928
Facs: (202) 514-8624

June 30, 2014

Attorneys for Defendant

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ i

STATEMENT OF FACT .......................................................................................................... 3

ARGUMENT ............................................................................................................................ 8

    I.      Standard Of Review For A Motion To Dismiss ....................................................... 8

    II.     SpaceX Lacks Standing To Bring A Challenge To Any Sole-Source
           Purchases Under Contract No. FA8811-13-C-0003 Because SpaceX Is
           Not An "Interested Party" To That Contract ............................................................ 9

           A.     SpaceX Is Neither An Actual Nor A Prospective Bidder ............................ 10

           B.     SpaceX Does Not Possess The Requisite Economic Interest ...................... 14

           C.     SpaceX Cannot Rely On A Pre-Award Standard To Establish Its
                  Standing ....................................................................................................... 15

    III.    In Any Event, SpaceX Has Waived Its Right To Challenge Purchases
           Under Contract No. FA8811-13-C-0003 By Not Making That Challenge
           Before Contract Award ........................................................................................... 17

CONCLUSION ....................................................................................................................... 20

# TABLE OF AUTHORITIES

<u>Cases</u>

*Anderson v. United States,*
   344 F.3d 1343 (Fed. Cir. 2003) ................................................................................. 7

*Blue & Gold, Fleet, L.P. v. United States,*
   492 F.3d 1308 (Fed. Cir. 2007) ................................................................. 16, 17, 18

*Linc Government Serv., LLC v. United States,,*
   95 Fed. Cl. 672 (2010) ........................................................................................... 18

*Clarke v. Securities Indus. Ass'n,*
   479 U.S. 388 (1987) ................................................................................................ 17

*COMINT Sys. Corp. v. United States,*
   700 F.3d 1377 (Fed. Cir. 2012) ......................................................................... 15, 16

*Def. Tech., Inc. v. United States,*
   99 Fed. Cl. 103 (2011) ............................................................................................ 14

*Digitalis Educ. Solutions, Inc. v. United States,*
   664 F.3d 1380 (Fed. Cir. 2012) ...................................................................... passim

*Distributed Solutions, Inc. v. United States,*
   539 F.3d 1340 (Fed. Cir. 2008) ................................................................................ 8

*Erinys Iraq Ltd. v. United States,*
   78 Fed. Cl. 518 (2007) ............................................................................................ 17

*Esterhill Boat Serv. Corp. v. United States,*
   91 Fed. Cl. 483 (2010) ............................................................................................ 18

*George W. Kane, Inc.v. United States,*
   26 Cl. Ct. 655 (1992) ................................................................................................ 7

*IHS Global, Inc. v. United States,*
   106 Fed. Cl. 734 (2012) .......................................................................................... 12

*Jumah v. United States,*
   90 Fed. Cl. 603 (2009) .............................................................................................. 8

*Lavezzo v. United States,*
   74 Fed. Cl. 502 (2006) .............................................................................................. 7

*Linc Government Serv., LLC v. United States*,
  95 Fed. Cl. 672 (2010) ............................................................................ 18

*Media Techs. Licensing LLC v. Upper Deck Co.*,
  334 F.3d 1366 (Fed. Cir. 2003) ................................................................ 7

*Moore's Cafeteria Servs. v. United States*,
  77 Fed. Cl. 180 (2007) ............................................................................ 17

*Myers Investigative & Sec. Servs. v. United States*,
  275 F.3d 1366 (Fed. Cir. 2002) ........................................................ 15, 17

*Reed Island-MLC, Inc. v. United States*,
  67 Fed. Cl. 27 (2005) ................................................................................ 8

*Rex Serv. Corp. v. United States*,
  448 F.3d 1305 (Fed. Cir. 2006) ........................................................ passim

*Rocovich v. United States*,
  933 F.2d 991 (Fed. Cir. 1991) .................................................................. 8

*Scheuer v. Rhodes*,
  416 U.S. 232 (1974) .................................................................................. 7

*Stauffer v. Brooks Bros.*,
  619 F.3d 1321 (Fed. Cir. 2010) .............................................................. 19

*Toxgon Corp. v. BNFL, Inc.*,
  312 F.3d 1379 (Fed. Cir. 2002) ................................................................ 8

*Weeks Marine, Inc. v. United States*,
  575 F.3d 1352 (Fed. Cir. 2009) ........................................................ 15, 17

## **Statutes**

28 U.S.C. § 1491(b) ........................................................................... 8, 9, 17

10 U.S.C. § 2326 ...................................................................................... 6

## **Regulations**

48 C.F.R. § 217.74 .................................................................................... 6

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

_____
)
SPACE EXPLORATION               )
TECHNOLOGIES CORP.,             )
                    Plaintiff,  )
        v.                      )    No. 14-354 C
                                )    (Judge Braden)
THE UNITED STATES,              )
                    Defendant,  )
        and                     )
                                )
UNITED LAUNCH SERVICES,         )
LLC,                            )
            Defendant-Intervenor.  )
_____ )

## DEFENDANT'S MOTION TO DISMISS PORTIONS OF PLAINTIFF'S COMPLAINT RELATED TO CONTRACT NO. FA8811-13-C-0003

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC), we respectfully request that the Court dismiss a portion of the amended complaint filed by plaintiff, Space Exploration Technologies Corp. (SpaceX), for lack of jurisdiction.[1] Consideration of this motion will help focus this litigation by clarifying the relief that SpaceX is seeking, facilitate the parties' determination of the scope of the administrative record, and assist the parties in planning an appropriate briefing schedule.[2]

---

[1] SpaceX has sought leave to amend its complaint a second time on June 25, 2014. ECF Doc. 72. Because the Court has not yet granted SpaceX leave to file the second amended complaint, our motion to dismiss cites only to the first amended complaint that SpaceX submitted on May 19, 2014. However, because none of the amendments that SpaceX proposes cure the jurisdictional defects that we identify in this motion, our motion applies equally to that complaint as well. *See* ECF Doc. 73.

Regardless of whether the Court grants SpaceX leave to amend its complaint, we respectfully request that the Court relieve us of the requirement to file any answer, consistent with the normal procedures in bid protests filed under 28 U.S.C. § 1491(b)(1).

[2] In support of this motion, we rely upon the following brief, documents submitted as part of the administrative record, and the accompanying appendix.

SpaceX's complaint is amorphous.  Rather than challenge a single procurement action, SpaceX broadly protests *any* sole-source purchase of single-core evolved expendable launch vehicles (EELV) and associated launch services.[3]  *See, e.g.*, SpaceX Amended Complaint, ECF Doc. 53, ¶¶ 1, 11–14, 81–97 (Am. Compl.).  This challenge appears to implicate the United States Air Force's entire EELV program—including past and future purchases under various contracts.

In order to expedite the resolution of this case and limit unnecessary expenditure of time and resources, the Court should narrow the scope of this protest by dismissing any challenge to purchases under one such contract—contract no. FA8811-13-C-0003—for lack of jurisdiction.  That contract provides a vehicle for the Air Force to purchase up to 35 cores from defendant-intervenor, United Launch Services, LLC (ULS).  The Air Force awarded that contract pursuant to a request for proposal (RFP) that the agency issued in March 2012.  SpaceX knew about the agency's intent to award a sole-source contract to ULS, and received a copy of the RFP less than a month after it was issued.  Yet SpaceX failed to object—or to indicate that it too could compete for the eventual contract.  Although SpaceX may have ongoing concerns regarding the EELV program that it wishes to explore, SpaceX's own failure to timely object to the RFP means that it does not have standing to bring those complaints to this Court by challenging what it calls the "block buy" contract.

---

[3]  In common terms, the evolved expendable launch vehicle is a rocket for launching satellites into orbit.  The "core" of an EELV is the first stage of the rocket—that is, the engine, the fuel tanks, and the remaining assembly which provides the initial thrust to launch the rocket.  *See* Appendix A, Declaration of Tracy E. Stroud ¶ 6 (Stroud Decl.).

# STATEMENT OF FACT

Since 2011, the Air Force has made the types of sole-source purchases that SpaceX challenges under three different contracts.  The first, contract no. FA8811-11-C-0001, was awarded as an undefinitized letter contract in May 2011.  The second, contract no. FA8811-13-C-0002, was awarded as an undefinitized letter contract in November 2012, and definitized in January 2014.  The third, contract no. FA8811-13-C-0003, was awarded as an undefinitized letter contract in June 2013, and definitized in December 2013.  SpaceX's complaint is mostly focused on this last contract, which SpaceX characterizes as the "block buy" of cores from ULS.  *See, e.g.*, Am. Compl. ¶¶ 48–50.[4]

Authority for procurements under these contracts is provided by a class justification and approval (J&A) that the Air Force issued on December 16, 2011.  *See* AR 37–45.[5]  This class J&A was the culmination of market research that the Air Force initiated in May 2011; at the time, the Air Force released a Request for Information, in which it asked prospective bidders to describe their space-launch capabilities.  Am. Compl. ¶ 47.  Based on all the information received, the Air Force determined that ULS was the only "'responsible source'" and the "'only launch provider'" that could meet the Air Force's requirements from Fiscal Year 2012 until Fiscal Year 2017.  *Id.* ¶ 48; AR 37–45.

The Air Force posted a public version of the J&A summarizing these findings to FedBizOpps in January 2012, along with a notice publicizing its intent to award a sole-source contract to ULS.  *See* AR 46–52; *see also* Evolved Expendable Launch Vehicle J&A,

---

[4]  That said, SpaceX confuses which purchases are made under which contract.  For example, in paragraph 95 of its amended complaint, SpaceX challenges "purchase of a Single Core Launch Vehicle for a GPS III-2 mission," which SpaceX characterizes as a "purchase order under Contract No. FA8811-13-C-0003."  Am. Compl. ¶ 95.  In fact, the core for the GPS III-2 mission was purchased under contract no. FA8811-13-C-0002.

[5]  "AR __" refers to the administrative record filed on June 3, 2014.  *See* ECF Doc. 66.

FedBizOpps.gov, https://www.fbo.gov/index?s=opportunity&mode=form&tab=core&id=360c6156488f806bb5235abad7bd9ab9 (last visited June 30, 2014).  The posted J&A explicitly stated the Air Force did not expect that SpaceX would be capable of competing for EELV launches until fiscal year 2016 and that the first competitive award would be made in fiscal year 2018.  AR 49–50.  SpaceX did not protest the J&A at the time it was issued.  Nor did SpaceX protest the J&A at any other point in the *two years* before it commenced this action.

Pursuant to the J&A, the Air Force issued a sole-source solicitation in March 2012 for what eventually became contract no. FA8811-13-C-0003.  *See* AR 53–250.  In that solicitation the Air Force requested that ULS submit an offer for EELV launch services to be ordered from Fiscal Year 2013 through Fiscal Year 2017 (identified as "Phase 1" of the EELV program).  *See id.*; Stroud Decl. ¶¶ 2, 5.  The solicitation was presented as a four-page cover letter with accompanying attachments.  *See* AR 53–250; Stroud Decl. ¶ 5.  The cover letter and attachments described the Air Force's requirements.  *Id.*  In particular, the cover letter stated that the Air Force was seeking the production and deployment of launch vehicles (made up of "cores"), as well as all relevant supporting services.  AR 53–56; Stroud Decl. ¶ 6.  The solicitation requested ULS to propose prices for anywhere between 18 and 50 cores.  AR 53–54; Am. Compl. ¶ 50.  The solicitation also explained that, in pricing its proposal, ULS should "assume a five-year annual ordering period to begin at award anticipated in [fiscal year] 2013 through [fiscal year] 2017] at a rate of eight (8) [launch vehicle] cores per [year]," for a total of 40 cores.  AR 53; *see also* Am. Compl. ¶ 50.  Further detail was provided in accompanying attachments.  *See* AR 57–250.[6]

_____

[6] For example, one attachment to the solicitation was the model contract, which included Special Contract Requirement clause H-0002, titled "REQUIREMENTS."  AR 106.  That clause referenced Federal Acquisition Regulation (FAR) Clause 52.216-21, and indicated that the order

The solicitation provided ULS 60 days to provide a proposal for launch capability—that is, services associated with launching the vehicle, including the infrastructure that supports a launch—and it provided ULS 90 days to propose launch vehicle production services.  *See* AR 53.

At this time, SpaceX—along with other companies—was working to become certified to compete for EELV and other National Security Space missions.  *See* Am. Compl. ¶¶ 57–61; Stroud Decl. ¶ 3.  To help these companies achieve this certification, the Air Force created the so-called New Entrant Certification Team.  *See* Stroud Decl. ¶ 3.  That team assisted prospective offerors—also known as "new entrants"—with the technical aspects of certification.  *See id.* Members of the team began working closely with SpaceX.  *See id.*; Appendix B, Declaration of Arnold Nowinski ¶¶ 2–3 (Nowinski Decl.).

To keep aspiring contractors informed regarding the Air Force's technical requirements and future contracting opportunities, the Air Force also created a secure website where agency officials could share documents with the new entrants.  Stroud Decl. ¶ 4; Nowinski Decl. ¶ 4. This website was known as the "New Entrant Bidders' Library."  Stroud Decl. ¶ 4; Nowinski Decl. ¶ 4.  Representatives from SpaceX were granted access to this library as early as November 2011.  Stroud Decl. ¶ 4; Nowinski Decl. ¶ 5.

After the Air Force issued the RFP to ULS, the contracting officer worked with members of the program office to prepare the solicitation for posting to the New Entrant Bidders' Library. Stroud Decl. ¶¶ 7–8.  On advice from the program office, the contracting officer redacted some ULS-proprietary information.  *Id.* ¶ 8.  Critically, however, the Air Force kept intact all the details about the quantity of cores that the Air Force could purchase under the solicitation, the

---

and production of launch vehicles part of the  contract would be a requirements contract for the five-year annual ordering period.  *See id.*

timing of those purchases, and the model contract describing the acquisition as a requirements contract.  *Id.*  Indeed, the Air Force did not redact *any* information from the four-page cover letter.  *Id.*

The contracting officer delivered the redacted version of the solicitation to a member of the New Entrant Team on April 13, 2012, who posted it on the Bidders' Library that evening. *See* Stroud Decl. ¶¶ 9–10; Nowinski Decl. ¶ 6.  Members of SpaceX thus had access to the RFP 40 days before the deadline for ULS to submit a proposal for launch services, and 70 days before the deadline for ULS to submit a proposal for producing launch vehicles.  Nowinski Decl. ¶ 8.

The contracting officer did not receive any response to the solicitation from SpaceX representatives.  *See* Stroud Decl. ¶ 12; *see* Nowinski Decl. ¶ 6.  SpaceX did not submit a capability statement to indicate that it could compete for the contract.  Stroud Decl. ¶ 12; *see also* Nowinski Decl. ¶ 6.  Nor did SpaceX submit any protest to the contracting officer, the Government Accountability Office, or this Court during the proposal period.  Stroud Decl. ¶ 12. Indeed, SpaceX's first challenge to any aspect of contract no. FA8811-13-C-0003 was this protest, which SpaceX filed in April 2014—two years after it first received a copy of the solicitation.

Meanwhile, ULS submitted timely responses to the solicitation on June 8, 2012, and August 23, 2012,[7] and the Air Force began its evaluation process.  On November 27, 2012, the Under Secretary of Defense for Acquisition, Technology, and Logistics, Mr. Frank Kendall, issued an acquisition decision memorandum which provided authorization for the Air Force to procure, via a requirements contract, up to 36 EELV cores from ULS between Fiscal Years 2013 and 2017 and compete up to 14 additional EELV cores once new entrants were capable of

---

[7]  As indicated above, the responses were originally due 60 and 90 days from the date of the solicitation.  *See* AR 53.  However, ULS received extensions of the original deadlines.

competing.  Am. Compl. ¶¶ 51–53; AR 280–81.  Following this decision memorandum, the Air

Force published the 2014 EELV Program Objective Memorandum on the Air Force

Comptroller's website in April 2013.  *See* Department of Defense Fiscal Year (FY) 2014

President's Budget Submission, http://www.saffm.hq.af.mil/shared/media/document/AFD-

130408-083.pdf.  This memorandum stated that the Air Force would procure 36 EELV cores,

sole-source, from ULS.  *See id.* at 259 ("The Department designated 14 cores across Fiscal Year

(FY) 15– FY17 procurement years as open to competition based on the projected performance of

the designs described by potential New Entrants in their Statements of Intent (SOI) as well as

providing 36 cores to United Launch Alliance in FY13–17.").

On June 26, 2013, pursuant to 10 U.S.C. § 2326 and the Defense Federal Acquisition

Regulation Supplement subpart 217.74, 48 C.F.R. § 217.74, the Air Force and ULS entered into

a letter contract—designated as no. FA8811-13-C-0003—with undefinitized terms and

conditions.  *See* AR 297–324.  That letter contract included a Special Contracts Requirement

clause, H-0002, which listed annual ordering requirements that total up to 35 launch cores, and it

included orders for seven launch services for Fiscal Year 2013.  *See* AR 311.  After the Air Force

had sufficient time to analyze ULS's proposal, the Air Force negotiated with ULS regarding the

final terms of the contract from July 29, 2013, until November 14, 2013.

The terms and conditions for contract no. FA8811-13-C-0003 were finalized on

December 18, 2013.  *See* AR 329.  A notice of definitization of the letter contract was posted to

defense.gov on December 16, 2013 and on the FedBizOps website on December 18, 2013.  *See*

EELV FY13–17 Launch Vehicle Production Services and Annual Options for Associated

Launch Capability FY15–19, FedBizOpps.gov, https://www.fbo.gov/index?s=opportunity&

mode=form&tab=core&id=929c1db4f01042618d8c73385ba5d45f.  The definitized contract

finalized the contract's terms and conditions, definitized prices for fiscal year 2013, and added

seven launch vehicle core orders for Fiscal Year 2014.  *See* AR 329–508.

On January 6, 2014, SpaceX flew the third and final flight required for certification of its

Falcon 9 v1.1 launch vehicle as part of the process to request new-entrant certification.  *See* Am.

Compl. ¶¶ 23, 58.

SpaceX filed this protest on April 28, 2014.

## ARGUMENT

## I.   Standard Of Review For A Motion To Dismiss

Although this Court is an Article I tribunal, it is subject to the same jurisdictional limits

as Article III courts.  *See Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003).

Among these is the requirement that a plaintiff have standing to bring its claims; a "lack of

standing precludes a ruling on the merits."  *Media Techs. Licensing LLC v. Upper Deck Co.*, 334

F.3d 1366, 1370 (Fed. Cir. 2003).

When considering a motion to dismiss for lack of jurisdiction, the Court construes all

allegations in the light most favorable to the non-moving party.  *Lavezzo v. United States*, 74

Fed. Cl. 502, 507 (2006) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).  Nevertheless, a

plaintiff has the burden of establishing jurisdiction.  *See George W. Kane, Inc.v. United States*,

26 Cl. Ct. 655, 657 (1992).  In deciding whether a plaintiff has carried this burden, the Court is

not bound by the allegations in the complaint; rather, the Court may look "beyond the pleadings

and 'inquire into jurisdictional facts' in order to determine whether jurisdiction exists."  *Jumah v.*

*United States*, 90 Fed. Cl. 603, 606 (2009) (quoting *Rocovich v. United States*, 933 F.2d 991, 993

(Fed. Cir. 1991)); *see also Reed Island-MLC, Inc. v. United States*, 67 Fed. Cl. 27, 32 (2005)

(explaining that considering evidence outside the pleadings does not convert a 12(b)(1) motion

into a motion for summary judgment) (citing *Toxgon Corp. v. BNFL, Inc.*, 312 F.3d 1379, 1383 (Fed. Cir. 2002)).

Similarly, in evaluating a motion such as this, the Court is not bound by the contents of the administrative record; the record circumscribes the Court's evaluation of the *merits* of the agency's decision. *See* 28 U.S.C. § 1491(b)(4). A plaintiff's standing to challenge that decision is an issue distinct from the merits of the agency's decision.

## II.    SpaceX Lacks Standing To Bring A Challenge To Any Sole-Source Purchases Under Contract No. FA8811-13-C-0003 Because SpaceX Is Not An "Interested Party" To That Contract

SpaceX's complaint does not identify the specific procurement action that SpaceX challenges. However, SpaceX's argument appears to be that *any* sole-source purchase of single-core launches from ULS is improper. *See, e.g.*, Am. Compl. ¶¶ 1, 11–14, 81–97. In SpaceX's view, all such launches must be competed now that SpaceX has performed the third certifying flight of its single-core Falcon 9 v1.1 launch vehicle and submitted test data to the Air Force. *See id.* As SpaceX recognizes, the majority of these purchases are covered by contract no. FA8811-13-C-0003. *See, e.g., id.* ¶¶ 1, 50, 70, 95. To the extent that SpaceX challenges purchases under that contract, it is, in fact, challenging the Air Force's decision to enter into the contract itself. *Cf. Distributed Solutions, Inc. v. United States*, 539 F.3d 1340, 1346 (Fed. Cir. 2008) (noting that "adding work to an existing contract that is clearly within the scope of the contract does not raise a viable protest under § 1491(b)(1)").

The Court's jurisdictional statute, 28 U.S.C. § 1491(b)(1), sets limits on who can bring this type of challenge. Under its provisions, a procurement can only be challenged by an "interested party." *Id.* To be an "interested party" after contract award, an entity must show that it is "an actual or prospective bidder" *and also* prove a "direct economic interest" in the

procurement. *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006). A failure

on either prong means that a party lacks standing. *See Digitalis Educ. Solutions, Inc. v. United*

*States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012) ("Only an 'interested party' has standing to

challenge a contract award.") (quoting *Rex Serv.*, 448 F.3d at 1307).

Here, SpaceX fails on both prongs of the "interested party" standard with respect to this

contract. Any portion of its complaint that relates to this contract should therefore be dismissed.

A.      <u>SpaceX Is Neither An Actual Nor A Prospective Bidder</u>

First, SpaceX was neither an actual nor a prospective bidder with respect to contract no.

FA8811-13-C-0003. In its complaint, SpaceX only alleges that it *could* be a bidder for *future*

single-core missions because it has completed its certification flights. *See, e.g.*, Am. Compl. ¶¶

11, 14–16. But this is not enough.

Generally, to be an actual or prospective bidder, an entity must have either submitted an

offer or be "*expecting* to submit an offer prior to the closing date of the solicitation." *Rex Serv.*

448 F.3d at 1308 (emphasis in original). Of course, sole-source procurements are not open to

bidding. But the Federal Circuit considered this distinction in *Digitalis*, and found that it is

immaterial. 664 F.3d at 1385.

The circumstances in *Digitalis* were similar to those here. In that case, a protestor

challenged a sole-source award, arguing that the agency should have conducted a full

competition for the contract. *Id.* at 1384. However, the protestor had not submitted any

objection to the agency's published statement of intent to award a sole-source contract. *Id.* at

1383. As the Federal Circuit explained, the agency's notice gave parties five days to challenge

that intended award by submitting a statement indicating their capability to perform the

contract—however, by its own admission, the protestor did not check the notice until well after

the time had expired.  *Id.*  On these facts, the Court concluded that the protestor was not an actual

or prospective bidder.

      As the Court explained, a party can only "be an actual or prospective bidder" if that party

alerts the agency to the fact that it would like to compete for the contract.  *See id.*  To do so, the

Federal Circuit held, "a party must submit a statement of capability during the prescribed

period."  *Id.* at 1385.  This "opportunity to become a prospective bidder ends when the proposal

period ends."  *Id.*  To hold otherwise, the Court noted, "would open the procurement process up

to an infinite number of challenges even long after the procurement process ended."  *Id.* at 1386.

Because the protestor failed to make the required submission, the Court held that it lacked

standing to challenge the award.  *Id.*

      In reaching this holding, the Court rejected the protestor's argument that submitting a

statement of capability would have been futile because the agency structured its requirements to

favor the intended awardee.  *Id.* at 1386.  Rather, the Court explained that—to excuse its failure

to submit a statement of capability—the protestor had to show that it was unreasonable for the

agency "to expect contractors to see a notice and respond" within the time period allotted.  *Id.*

However, the Court concluded that was not the case before it because at least one other offeror

managed to see the notice and respond within the required five days.  *Id.*

      *Digitalis* is controlling here.  SpaceX knew about the Air Force's intent to award a sole-

source contract to ULS from the moment the Air Force published the J&A in January 2012.

Moreover, SpaceX actually received a copy of the sole-source RFP in which the Air Force

requested that ULS submit its proposal for such a contract.  *See* Stroud Decl. ¶¶ 9–11.  That

solicitation gave ULS 60 days to submit a proposal launch capability CLINs, and it gave ULS 90

days to submit a proposal for launch vehicle production.  *See* AR 53.  To be an actual or

prospective bidder after *Digitalis*, SpaceX was required to file a capability statement or to protest the RFP in this Court before those deadlines expired. *See Rex Serv.*, 448 F.3d at 1308 (explaining that, to be an actual bidder, an offeror must submit a bid or "a timely bid protest in the Court of Federal Claims, in which it established that it expected to bid prior to the close of the solicitation period, but was prevented from doing so on the basis of improper agency action"). Yet, as the contracting officer explains in her declaration, SpaceX did neither. *See* Stroud Decl. ¶ 12. Indeed, SpaceX does not even *allege* that it submitted a capability statement or a protest, or took any other action to make itself an actual or a prospective bidder.

Of course, the reason that SpaceX did not submit such a capability statement—or for that matter, the reason that it did not protest—is obvious. At the time the solicitation was issued, SpaceX had not completed the necessary certifying flights for its Falcon 9 rocket; it was very far from having a launch vehicle that could meet the agency's requirements. *Cf.* Am. Compl. ¶¶ 23, 58 (stating that SpaceX completed its "final certification launch . . . on January 6, 2014"). Simply put, at the time that the Air Force issued the RFP, SpaceX would not have been a qualified bidder.

However, as the Federal Circuit explained in *Digitalis*, the mere fact that submitting a bid or a protest might have been futile does not mean that SpaceX automatically has standing now. *See Digitalis*, 664 F.3d at 1385–86. To the contrary, the requirement that an offeror engage with the procurement process before the submission of bids is a hard rule. *See id.* To hold otherwise, the Federal Circuit recognized, "would open the procurement process up to an infinite number of challenges even long after the procurement process ended": any time a new bidder became qualified it could seek to have the agency restructure its entire procurement scheme. *Id.* at 1386. This would be an untenable result. *See id.*

The only way that SpaceX could have standing now is if it made a showing that it was somehow prevented from submitting a capability statement or a protest. *See Rex Serv.*, 448 F.3d at 1308; *see also IHS Global, Inc. v. United States*, 106 Fed. Cl. 734, 745 (2012) (reviewing case-law and explaining that an offeror can have standing if it demonstrates that the Government's "actions wrongfully prevent [the] bidder from qualifying for or bidding on a solicitation" (internal quotes and citations omitted)). But there is no way SpaceX can make this showing.

As Mr. Nowinski and the contracting officer explain in their declarations, the solicitation was posted to a secure website—the New Entrants Bidders' Library—in April 2012, shortly after it was released to ULS. *See* Stroud Decl. ¶¶ 9–10; Nowinski Decl. ¶¶ 6–7. In addition, agency representatives posted all the supporting documentation for the solicitation. *See* Stroud Decl. ¶¶ 9–10; Nowinski Decl. ¶¶ 6–7. Although some of this documentation was redacted to remove ULS's proprietary information, no part of the main solicitation—the first four pages that defined what the Air Force wanted to purchase—was obscured. *See* Stroud Decl. ¶ 8. Specifically, the solicitation clearly stated that the Air Force could purchase up to 50 launch vehicle cores and the accompanying services, and that these purchases would be made sole-source from ULS. *See* AR 53; Stroud Decl. ¶ 6. Additionally, the solicitation instructed the contractor to assume "a five-year annual ordering period to being at award anticipated in GFY 2013 through GFY 2017 at a rate of eight (8) [launch vehicle] Cores per GFY as defined in Attachment 1." *See* AR 53.

SpaceX representatives had access to all of these materials as soon as they were posted on the New Bidders' Library in April 2012. *See* Stroud Decl. ¶¶ 4, 11; Nowinski Decl. ¶¶ 5, 7. Indeed, SpaceX representatives had access to the Library starting in November 2011, and knew that new material was periodically posted there. *See* Stroud Decl. ¶ 4; Nowinski Decl. ¶ 5. By

the most conservative calculation, after the solicitation was posted, SpaceX had access to it for *at least* 40 days before the *first* proposal deadline.  That was more than enough time to review the agency's requirements and respond with either a statement of capability or a protest.  For example, in *Digitalis*, the Federal Circuit found a period of five days reasonable.  *See Digitalis*, 664 F.3d at 1386.  SpaceX had over *nine times* more time, yet it failed to act.  This failure now defeats its standing to challenge purchases under contract no. FA8811-13-C-0003.

B.      SpaceX Does Not Possess The Requisite Economic Interest

SpaceX's failure to timely indicate an interest in competing for the RFP also means that SpaceX lacks the "direct economic interest" required to challenge the awarded contract.

The Federal Circuit has explained that "direct economic interest" is not some inchoate or general connection to the procurement.  *See Rex Serv.*, 448 F.3d at 1308.  Nor is the interest established by merely alleging—as SpaceX had done—that the contract at issue is one that the protestor would like to perform—or that the protestor desires the financial rewards that the contract offers.  *See, e.g.*, Am. Compl. ¶¶ 21, 25.  Rather, to "prove a direct economic interest, a party must show that it had a 'substantial chance' of winning the [challenged] contract" absent the agency's errors.  *Digitalis*, 664 F.3d at 1384 (quoting *Rex Serv.*, 448 F.3d at 1308).

As the Federal Circuit held in *Digitalis*, an offerror cannot *possibly* make this showing if it failed to timely respond to the solicitation.  *See id.* at 1385.  Simply put, failure to "submit a statement of capability during the prescribed period . . . . means that a party does not have the requisite direct economic interest because it cannot have a 'substantial chance' of convincing the government to hold a formal competition and subsequently bid on the contract."  *Id.* (quoting *Rex Serv.*, 448 F.3d at 1308).

SpaceX, of course, failed to submit such a capability statement in response to the March 2012 solicitation.  *See* Stroud Decl. ¶ 12.  Nor, as explained in the prior section, did it indicate any dissatisfaction with the Air Force's intent to procure the launches sole-source from ULS.  Like the plaintiff in *Digitalis*, SpaceX took no steps to get involved in the procurement at the time that the agency was planning its course.  It is too late for SpaceX to try to bring a challenge to that procurement now.

     C.     <u>SpaceX Cannot Rely On A Pre-Award Standard To Establish Its Standing</u>

Tellingly, SpaceX simply ignores the established two-prong standing requirement in its complaint.  Instead, SpaceX tries to establish its standing using a different standard:  according to SpaceX, it should be considered an "interested party" because it "'could compete for the contract if the bid process were made competitive.'"  Am. Compl. ¶ 20.  (quoting *Def. Tech., Inc. v. United States*, 99 Fed. Cl. 103, 115 (2011) (internal quotations omitted)).  However, this formulation for what it means to be an "interested party" comes from a case examining a plaintiff's standing in a *pre-award protest*.  *See Def. Tech.*, 99 Fed. Cl. at 115.  It does not apply in a post-award challenge such as this one.

The Federal Circuit has recognized that an offeror's interests with respect to a procurement are not immutable; rather, they change as that procurement progresses.  Award of a contract is a significant marker that creates new rights for the awardees.  At the same time, however, award of the contract necessarily limits the rights of unsuccessful offerors.  As the Federal Circuit acknowledged in *Weeks Marine, Inc. v. United States*, such change in substantive rights necessarily affects parties' standing.  575 F.3d 1352, 1362 (Fed. Cir. 2009).  Prior to award, the agency has not yet evaluated the offers—identifying the degree of interest that a particular offeror has in the contract award is therefore difficult.  *See id.* at 1361.  Indeed, certain

pre-award protests are brought before the period for proposals closes; in those cases offerors can still bring themselves within the zone of parties directly affected by the procurement by submitting a bid. *See id.* For this reason, a looser standard of prejudice applies. *Id.* An offeror can have standing to challenge the procurement so long as it can show a "non-trivial competitive injury which can be addressed by judicial relief." *Id.* However, things change once the bid process closes and the agency actually evaluates offers. At that point, the agency establishes a hierarchy of proposals, and only offerors that are closest to receiving award can be said to have an interest in the agency's actions. *Id.* A stricter standing requirement reflects this development: post-award, an offeror must meet the familiar two-part standard. *Cf. COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1383 n.7 (Fed. Cir. 2012) (explaining that the pre-award standard for standing does not apply in a post-award protest).

This tightening of the standing requirements after contract award is as true for sole-source procurements as it is for competitive ones. *See Digitalis*, 664 F.3d at 1385. Indeed, there is no reason to distinguish the two on this ground. *See id.* ("We see no reason to limit [the standing requirements] to competitive pro[]curements."); *see also Myers Investigative & Sec. Servs. v. United States*, 275 F.3d 1366, 1371 (Fed. Cir. 2002) (noting that the notion "that the substantial chance requirement should not be applied in sole source procurements . . . . [has been] considered and rejected"). Contract award is just a significant of a marker in the sole-source context as it is in the competitive sphere. *See Myers*, 275 F.3d at 1371. Using a pre-award standard to establish standing *after* the contract has been signed—as SpaceX would like to do—would be improper. *See COMINT*, 700 F.3d at 1383 n.7.

Simply put, to now have standing to protest contract no. FA8811-13-C-0003, SpaceX should have indicated its desire to compete at the time the Air Force issued the solicitation in

2012—something SpaceX completely failed to do.  Accordingly, any portion of SpaceX's

complaint related to that contract should be dismissed for lack of jurisdiction.

### III.      In Any Event, SpaceX Has Waived Its Right To Challenge Purchases Under Contract No. FA8811-13-C-0003 By Not Making That Challenge Before Contract Award

In addition to failing the two-prong standing requirement, SpaceX also cannot challenge

purchases under contract no. FA8811-13-C-0003 because those purchases were explicitly

contemplated in the solicitation that the Air Force issued in March 2012.  As the Federal Circuit

has recognized, a protester's right to challenge something that was provided in the solicitation is

limited:  any allegation that, by acting in accordance with the solicitation, the agency violates a

statutory provision must be raised *prior* to contract award.  *See Blue & Gold, Fleet, L.P. v.*

*United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007).  After award, such challenges are barred.

*Id.*

In *Blue & Gold*, the plaintiff challenged an agency's award of a contract to an offeror

whose proposal did not include certain wages and benefits required by statute.  492 F.3d at 1312.

In reviewing this claim, the Federal Circuit held that the plaintiff's challenge was not to the

agency's evaluation of the proposal, but rather to an ambiguity in the solicitation, which had

included no mention of statutory wage requirements.  *Id.*  Such challenges to the terms of a

solicitation, the court held, had to come before contract award:  "a party who has the opportunity

to object to the terms of a government solicitation containing a patent error and fails to do so

prior to the close of the bidding process waives its ability to raise the same objection afterwards

in a § 1491(b) action."  *Id.* at 1315.  As the court noted, barring untimely protests served the

statutory purpose of 28 U.S.C. § 1491(b)(3), which requires that courts give "due regard" for the

need to resolve protests expeditiously.  *Id.* at 1313.  Absent any restriction on their rights to

challenge "what they believe is an unfair solicitation," vendors could "sit on their rights . . . roll

the dice [to] see if they receive award," and then, if their initial proposals prove to be

unsuccessful, "come forward with the defect to restart the bidding process." *Id.* at 1314.  Such

gamesmanship would be unfair, and would create "costly after-the-fact litigation" that is

anathema to the purpose of the statute.  *Id.*  Accordingly, the court explained, a rule barring such

challenges was required.  *Id.*; *see also Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 399

(1987) (explaining that plaintiffs lack standing to enforce interests that are "inconsistent with the

purposes implicit in [a] statute" under which suit is brought).

The *Blue & Gold* rule is robustly applied by this Court.  *See, e.g.*, *Weeks Marine, Inc. v.

United States*, 575 F.3d 1352, 1363 (Fed. Cir. 2009) (discussing cases in which the United States

Court of Federal Claims applied *Blue & Gold*).  For example, in *Moore's Cafeteria Servs. v.

United States*, the plaintiff failed to timely object to an amendment to a solicitation during the

bidding process.  77 Fed. Cl. 180, 184–85 (2007).  The Court held that *Blue & Gold* barred the

plaintiffs' claim:  "the plaintiff had the opportunity to object to the terms of the solicitation

during the bidding process, and in not doing so, waived its right to do so before this [C]ourt."  *Id.*

*See also Erinys Iraq Ltd. v. United States*, 78 Fed. Cl. 518, 533 n.7 (2007) (finding that to the

extent that the protestor was challenging the solicitation's comparison of "Fixed Labor Rate task

orders instead of hourly labor rates," the challenge was untimely and should have been raised

"prior to the closing date for receipt of proposals").  Indeed, this Court has held that even filing a

protest at GAO or before the agency does not preserve a protestor's challenge; only filing a

timely protest in the United States Court of Federal Claims satisfies the *Blue & Gold* waiver rule.

*See Esterhill Boat Serv. Corp. v. United States*, 91 Fed. Cl. 483 (2010).  *But see Linc

Government Serv., LLC v. United States*, 95 Fed. Cl. 672, 691–93 (2010).

Any challenge that SpaceX can make to the Air Force's sole-source purchase of launches under contract no. FA8811-13-C-0003 falls squarely within the purview of *Blue & Gold* and the other cases applying that decision.  The purchase of those launches was explicitly contemplated within the solicitation that the Air Force issued in March 2012.  To the extent that SpaceX believes that any such purchase was improper, it is dissatisfied with a patent term in the solicitation.  Yet SpaceX did not raise *any* objection to the solicitation at the time it was issued.  *See* Stroud Decl. ¶ 12.  Nor did SpaceX object at any point during the *two years* while the Air Force negotiated with ULS.  *See id.*  Rather, only now that SpaceX believes it can compete does it raise—for the very first time—an argument that implicates the solicitation's terms.  This tactic is explicitly barred.  *See Blue & Gold*, 492 F.3d at 1313.  As the Federal Circuit explained, vendors are not allowed to sit on their rights in the hopes of securing a contract and then, when those hopes are dashed, undo the entire evaluation scheme by challenging the basis upon which the procurement was conducted.  *See id.*

The fact that SpaceX was *not* eligible to compete for the solicitation at the time it was issued does not affect this rule's application.  The purpose of *Blue & Gold* is to prevent offerors from restarting the agency's procurement process any time they believe that circumstances have changed.  If this rule were waived for every bidder that became qualified *after* the agency awarded the contract, procurements would be open to endless challenge.  The Court's jurisdictional statute does not contemplate this result.

Simply put, the fact that SpaceX did not find it necessary to challenge the procurement at the time it was issued does not give SpaceX license to now go back and seek to undo two years of planning and work by the agency.  To the contrary, SpaceX's failure to timely object to the Air Force's chosen contract vehicle bars SpaceX's standing to challenge that vehicle now.  *See,*

-19-

*e.g.*, *Stauffer v. Brooks Bros.*, 619 F.3d 1321, 1327 (Fed. Cir. 2010) (explaining that standing

"requires a claim to an injury of a legally cognizable right") (quoting 15 JAMES WM. MOORE ET

AL., MOORE'S FEDERAL PRACTICE ¶ 101.40 (3d ed. 2010)).

## CONCLUSION

For these reasons, we respectfully request that the Court dismiss any portion of SpaceX's

complaint related to contract no. FA8811-13-C-0003 for lack of jurisdiction.


Respectfully submitted,

STUART F. DELERY
Assistant Attorney General

ROBERT KIRSCHMAN
Director

 s/ Kirk T. Manhardt
KIRK T. MANHARDT
Assistant Director

OF COUNSEL:                            s/ Alexander V. Sverdlov
                                       ALEXANDER V. SVERDLOV
JEFFREY P. HILDEBRANT                  MATTHEW ANDRADE
Trial Attorney                         DEVIN WOLAK
Federal Courts Branch                  Trial Attorneys
U.S. Air Force Commercial Law          Commercial Litigation Branch
  and Litigation Directorate           Civil Division
                                       U.S. Department of Justice
                                       PO Box 480
                                       Ben Franklin Station
                                       Washington, DC 20044
                                       Tele: (202) 307-5928
                                       Facs: (202) 514-8624

June 30, 2014                          Attorneys for Defendant

-20-