REDACTED VERSION

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

|  |  |
|---|---|
| SPACE EXPLORATION TECHNOLOGIES CORP., ) ) ) )| |
| Plaintiff, ) | |
| v. ) | Case No. 1:14-cv-00354-SGB |
| ) | Judge Susan G. Braden |
| THE UNITED STATES, ) | |
| Defendant, ) | |
| and ) | |
| UNITED LAUNCH SERVICES, LLC, ) | |
| Defendant-Intervenor. ) | |

## UNITED LAUNCH SERVICES, LLC's
## MOTION TO DISMISS FOR LACK OF JURISDICTION

Defendant-Intervenor United Launch Services, LLC ("ULS"), pursuant to RCFC 12(b)(1), respectfully requests that the Court dismiss Plaintiff Space Exploration Technologies Corporation's ("SpaceX") Amended Complaint in its entirety for lack of subject matter jurisdiction. In support of this motion, ULS submits the following brief, attached appendix and exhibit, Plaintiff's Amended Complaint, the Administrative Record filed by the Government, and the documents relied upon in Defendant's Motion to Dismiss Portions of Plaintiff's Complaint Related to Contract No. FA8811-13-C-0003.

# TABLE OF CONTENTS

                                                                                          **Page**

TABLE OF CONTENTS ............................................................................................ ii

TABLE OF AUTHORITIES ..................................................................................... iii

SUMMARY OF ARGUMENT ..................................................................................... 1

QUESTIONS PRESENTED ........................................................................................ 4

STATEMENT OF THE CASE ..................................................................................... 5

   A.  The EELV Program. ........................................................................................ 5

   B.  SpaceX Received Clear Notice of the Air Force's Acquisition Strategy and Sole Source Procurement. ................................................................................................... 7

   C.  Air Force Criteria for Launch Services and SpaceX Capability. ...................................... 14

   D.  SpaceX's Current Amended Complaint. ......................................................................... 16

ARGUMENT ................................................................................................................ 17

   I.  This Court Lacks Jurisdiction to Entertain SpaceX's Complaint Because SpaceX Lacks Standing. ....................................................................................................... 17

     A.  SpaceX Lacks Standing Because It Is Not an Actual or Prospective Bidder for the EELV Phase 1 Contract. ................................................................................... 18

     B.  SpaceX Lacks a Direct Economic Interest in the Phase 1 EELV Contract. ................... 22

   II.  SpaceX's Failure to Timely File Its Protest Waived Any Right to Challenge the EELV Phase 1 Contract and Overall Acquisition Strategy. ......................................................... 27

CONCLUSION ............................................................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Am. Fed'n of Gov't Emps. v. United States*,
258 F.3d 1294 (Fed. Cir. 2001)...............................................................................17

*Arakaki v. United States*,
62 Fed. Cl. 244 (2004) .............................................................................................5

*Benchmade Knife Co., Inc. v. United States*,
79 Fed. Cl. 731 (2007)......................................................................................22, 28

*Blue & Gold Fleet, L.P. v. United States*,
492 F.3d 1308 (Fed. Cir. 2007)....................................................................... passim

*COMINT Sys. Corp. v. United States*,
700 F.3d 1377 (Fed. Cir. 2012).............................................................................22

*Def. Tech., Inc.. v. United States*,
99 Fed. Cl. 103 (2011) ..........................................................................................25

*Digitalis Educ. Solutions, Inc. v. United States*,
664 F.3d 1380 (Fed. Cir. 2012)................................................................18, 21, 23

*Distributed Solutions, Inc. v. United States*,
104 Fed. Cl. 368 (Fed. Cl. 2012) ...........................................................................26

*Dow Jones & Co. v. Ablaise Ltd.*,
606 F.3d 1338 (Fed. Cir. 2010).................................................................................4

*Emery Worldwide Airlines, Inc. v. United States*,
264 F.3d 1071 (Fed. Cir. 2001)...............................................................................26

*Fed. Data Corp. v. United States*,
911 F.2d 699 (Fed. Cir. 1990)...........................................................................2, 18

*Grupo Dataflux v. Atlas Global Group, L.P.*,
541 U.S. 567 (2004).................................................................................................4

*H.G. Prop. A, L.P. v. United States*,
68 Fed. App'x 192 (Fed. Cir. 2003).......................................................................26

*Heliotrope Gen. Inc. v. Ford Motor Co.*,
189 F.3d 971 (9th Cir. 1999) ...................................................................................5

*IHS Global Inc. v. United States,*
106 Fed. Cl. 734 (2012) ........................................................................................23

*Infrastructure Def. Techs., LLC v. United States,*
81 Fed. Cl. 375 (2008) ......................................................................21, 26, 27, 28

*Int'l Mgmt. Servs., Inc. v. United States,*
80 Fed. Cl. 1 (2007) .............................................................................................28

*Logistics Solutions Group, Inc.,*
B-294604.7, 2005 CPD ¶ 141 ........................................................................21, 29

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) .............................................................................................17

*Managed Care Concepts,*
LLC, B-402750, 2010 CPD ¶ 164 ......................................................................28

*MCI Telecomm. Corp. v. United States,*
878 F.2d 362 (Fed. Cir. 1989) ...................................................................... passim

*Media Techs. Licensing, LLC v. Upper Deck Co.,*
334 F.3d 1366 (Fed. Cir. 2003) ...........................................................................17

*Moyer v. United States,*
190 F.3d 1314 (Fed. Cir. 1999) ...........................................................................17

*Myers Investigative and Sec. Servs., Inc. v. United States,*
275 F.3d 1366 (Fed. Cir. 2002) .................................................................... passim

*Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.,*
998 F.2d 1192 (3d Cir.1993).................................................................................5

*Reilly v. United States,*
104 Fed. Cl. 69 (2012) .........................................................................................21

*Rex Serv. Corp. v. United States,*
448 F.3d 1305 (Fed. Cir. 2006) .................................................................... passim

*Rogers v. United States,*
95 Fed. Cl. 514 (2010) .........................................................................................17

*Space Exploration Techs. Corp. v. United States,*
68 Fed. Cl. 1 (2005) .............................................................................................16

*Staehr* v. *Hartford Fin. Servs. Grp., Inc.,*
547 F.3d 406 (2d Cir. 2008) ..................................................................................5

*Statistica, Inc. v. Christopher,*
  102 F.3d 1577 (Fed. Cir. 1996)..........................................................................22

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998)..........................................................................................17

*Sun Dial and Panel Corp.,*
  B-277660, 97-2 CPD ¶ 146.............................................................................29

**STATUTES**

10 U.S.C. § 2304 ................................................................................................10

28 U.S.C. § 1491 .......................................................................................... passim

31 U.S.C. § 3551 ................................................................................................17

**OTHER AUTHORITIES**

4 C.F.R. § 21.2 ..................................................................................................29

## SUMMARY OF ARGUMENT

The bid protest filed by Space Exploration Technologies Corporation ("SpaceX") seeks to force the United States Air Force to undo a long-term procurement of critical Evolved Expendable Launch Vehicle ("EELV") services from the only certified and eligible provider of such services, United Launch Services, LLC ("ULS"). This procurement was deliberate and well-publicized, taking place over more than eighteen months between November 2011 and June 2013 and concluding with the execution of a requirements contract between the Air Force and ULS. Throughout this process, the Air Force granted SpaceX extensive visibility into the procurement, including making available to SpaceX the Request for Proposal ("RFP") for the acquisition and even developing a path for new entrants, like SpaceX, to compete for future missions; yet SpaceX made no objection to the Air Force's procurement strategy and, in fact, publicly complimented it on multiple occasions.[1] Only after SpaceX determined that the Air Force's implementation of that strategy no longer suited it did SpaceX file this protest, more than two years after the strategy was announced and the RFP was issued, 22 months after proposals were due, and 10 months after the contract at issue was executed.

Under binding Federal Circuit precedent, SpaceX's inaction alone both deprives it of standing, *MCI Telecomm. Corp. v. United States*, 878 F.2d 362, 365 (Fed. Cir. 1989), and independently requires dismissal under *Blue and Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007), and the cases that followed it. But SpaceX's protest also suffers from an additional, even more fundamental flaw: Although SpaceX has been in business since 2002,

---

[1] *See, e.g.,* Dan Leone, *Pentagon Approves Dual-track Launcher Acquisition Strategy,* SPACENEWS, Dec. 7, 2012, App. 632-34, http://www.spacenews.com/article/military-space/32723pentagon-approves-dual-track-launcher-acquisition-strategy (quoting complimentary comments from SpaceX Chief Executive Officer Elon Musk about the Air Force's acquisition strategy).

SpaceX is not now, and never has been, certified to provide EELV services to the United States Air Force. For this reason as well, ULS respectfully submits that SpaceX's protest must be dismissed with prejudice without any further proceedings.

*First*, SpaceX lacks standing as an "interested party" to protest the contract awarded to ULS because it is not an "actual or prospective bidder" for, and otherwise lacks a direct economic interest in, the launch services covered by the contract. SpaceX is not an actual or prospective bidder for the simple reason that, after learning of the Air Force's Justification and Approval ("J&A") in January 2012 and receiving access to the RFP in April 2012, SpaceX never submitted a proposal nor protested the terms of the RFP before proposals were due. *See Rex Serv. Corp. v. United States,* 448 F.3d 1305 (Fed. Cir. 2006); *Fed. Data Corp. v. United States,* 911 F.2d 699, 704-705 (Fed. Cir. 1990). And for good reason: When the Air Force issued the J&A for the EELV acquisition and through the award of the actual contract to ULS in June 2013, SpaceX did not meet the published requirements to be eligible to launch National Security Space ("NSS") satellites and had not even flown a single EELV-class mission, making SpaceX ineligible to compete. Indeed, the SpaceX launch vehicle that is currently the subject of the Air Force's EELV certification program—the Falcon 9 v.1.1—did not have its first launch until three months after the requirements contract with ULS was signed. Even today, SpaceX is still not certified to launch EELV missions and cannot currently perform the full scope of the launch service requirements in the contract it is protesting. As such, SpaceX cannot invoke this Court's subject matter jurisdiction because it lacks standing to pursue this bid protest.

*Second*, by failing to file any protest before the RFP's proposal deadline, SpaceX has plainly waived any right to protest the Air Force's acquisition strategy and terms of the sole-source requirements contract under *Blue and Gold Fleet* and its progeny. SpaceX has been fully

2

aware of the Air Force's acquisition strategy to award ULS a sole-source contract for EELV launch services since at least January 2012, when the J&A for the procurement was published. In addition, SpaceX was fully aware of the EELV RFP and the Air Force's acquisition strategy as stated therein. The RFP, issued on March 23, 2012, required ULS to submit its proposal to the Air Force within ninety (90) days for core launch vehicle production services. At the latest, this would set ULS's proposal deadline—and, accordingly, SpaceX's deadline to file a bid protest—as June 21, 2012.[2] SpaceX's bid protest is now, at best, 22 months late. As such, SpaceX has waived any right to protest the Air Force's acquisition strategy and terms of the requirements contract with ULS.

To allow this untimely bid protest to continue any further would broadly and improperly expand this Court's jurisdiction to parties who are not capable of performing the work until several years after an RFP has issued and contract work has long begun, and who had never even submitted a proposal or filed a formal protest prior to the proposal submission deadline. The Court should reject SpaceX's attempt to rewrite the Court's well-settled decisions regarding interested party status and timeliness of protests—both prerequisites to the Court's jurisdiction. To do otherwise would open the flood gates and allow parties to wait years (until they are finally eligible to perform the work) to protest any contract award. This would severely undermine the efficiency of the procurement system, to which the Court must give due regard in exercising its jurisdiction, and encourage precisely the type of gamesmanship that SpaceX has engaged in here. 28 U.S.C. § 1491(b)(3); *see Blue & Gold Fleet*, 492 F.3d at 1314 ("A waiver rule thus prevents contractors from taking advantage of the government and other bidders and avoids costly after-the-fact litigation.").

---

[2] As the Government notes in its Motion to Dismiss, the RFP response time was extended for ULS until August 23, 2012. Gov't Motion to Dismiss, ECF Doc. 75, at 6. By this measure, SpaceX's protest is 20 months late.

Moreover, the absence of subject matter jurisdiction must be resolved as a ***threshold issue*** before this matter can proceed. *See Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 593 (2004) ("We have . . . urged counsel and district courts to treat subject matter jurisdiction as a ***threshold issue*** for resolution.") (emphasis added). Given the absence of subject matter jurisdiction, SpaceX cannot be permitted to expend the resources of this Court and the other parties to pursue this litigation. *See Dow Jones & Co. v. Ablaise Ltd.*, 606 F.3d 1338, 1348 (Fed. Cir. 2010) (reversing district court's denial of defendant's motion to dismiss for lack of jurisdiction; "Subject matter jurisdiction is a threshold requirement for a court's power to exercise jurisdiction over a case, and no amount of 'prudential reasons' or perceived increases in efficiency, however sound, can empower a federal court to hear a case where there is no extant case or controversy.").

For these and the reasons discussed in detail below, ULS respectfully requests this Court to DISMISS SpaceX's Amended Complaint in its entirety, with prejudice, pursuant to RCFC 12(b)(1) and 28 U.S.C. § 1491(b)(1).[3]

## QUESTIONS PRESENTED

***First***, does SpaceX have standing as an "interested party" to maintain this bid protest action pursuant to 28 U.S.C. § 1491(b)(1) where SpaceX (i) was not an actual or prospective bidder for ULS' existing contract; and (ii) SpaceX lacks a direct economic interest in the launch services required by ULS' existing contract because SpaceX was neither certified nor qualified at the time that proposals were due and at the time of contract award.

---

[3] Citations to SpaceX's complaint are to SpaceX's first Amended Complaint filed on May 19, 2014. Although SpaceX sought leave to amend its complaint a second time on June 25, 2014, ECF Doc. 72, the Court has not yet granted SpaceX leave to file the second amended complaint. Nevertheless, this motion to dismiss would also warrant dismissal of SpaceX's second amended complaint as none of the additional allegations contained in the second amended complaint would cure the jurisdiction defects identified herein.

*Second*, by not filing its protest until more than two years after the issuance of the J&A and RFP; more than 22 months after proposals were due; and 10 months after the contract at issue was executed, has SpaceX waived its right to protest the Air Force's acquisition strategy and terms of the requirements contract pursuant to the rule articulated in *Blue and Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007) and its progeny.

## STATEMENT OF THE CASE[4]

### A.    The EELV Program.

The EELV program originated in the mid-1990s in response to a series of studies, Congressional actions, and Presidential actions recognizing the need to improve U.S. space launch capabilities.  Reliably launching sensitive NSS satellites into their required orbits was—and still is—recognized as being of paramount importance.

The EELV program provides the Air Force and the National Reconnaissance Office ("NRO") with the capability and launch vehicles necessary to launch the U.S. Government's national security and defense satellites (often referred to as "National Security Space" or "NSS" satellites) into their proper orbits.  NSS satellites often cost well in excess of one billion dollars and have manufacturing lifecycles that routinely exceed a decade from concept to launch.  The NSS satellites provide critical support for the warfighter and our national security to include

---

[4]    For purposes of this motion to dismiss for lack of subject matter jurisdiction, the Court may properly consider information from the documents referenced herein.  *See Arakaki v. United States*, 62 Fed. Cl. 244, 247 (2004) ("When a party challenges the jurisdictional facts alleged in the complaint, the court may consider relevant evidence outside the pleadings to resolve the factual dispute.") (citations omitted).  In addition to the documents that are part of the Administrative Record or incorporated by reference in SpaceX's amended complaint, for the purpose of demonstrating SpaceX's and the public's notice of the Government's acquisition strategy, ULS submits that this Court may take judicial notice of documents that are part of the public record, *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1197 (3d Cir. 1993), and "judicial notice of the fact that press coverage . . . contained certain information" so long as the Court does no rely on the "truth" of that information.  *Staehr* v. *Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008); *Heliotrope Gen. Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999) ("We take judicial notice that the market was aware of the information contained in news articles submitted by the defendants.").

weather, mapping, military communications, intelligence, and surveillance. Any failure or schedule delay can impair our nation's ability to conduct or defend against military operations. The EELV program leaves no margin for error. *See* U.S. Air Force, Justification for Other Than Full and Open Competition 4-5, Dec. 16, 2011, AR 40-41 ("The inability to launch will delay the operational use of a spacecraft thereby reducing multiple constellations' operational availability and potentially endanger constellation health. This will reduce or preclude the ability of the warfighter to accomplish specific missions.").

Consequently, the Government requires that NSS launch missions be conducted using systems that have undergone rigorous and repeated testing and mission assurance procedures, with extensive Government oversight. *See* ACQUISITION STRATEGY DOCUMENT FOR THE EVOLVED EXPENDABLE LAUNCH VEHICLE (EELV) PROGRAM: FY2013-FY2017 ACQUISITION 6 (Nov. 24, 2011), AR 6 (the "ASD") ("In the late 1990's, the United States suffered six heritage space launch failures over a ten-month span, which resulted in the loss of three high-valued NSS spacecraft—more than $5B worth of hardware, and loss of critical national security capability. These failures and the lack of a commercial market to share in development and maturation of launch systems drove a change to the EELV program to focus primarily on mission success.").[5]

---

[5] *See* Statement of Gil I. Klinger, Deputy Assistant Secretary of Defense, Hearing Before the H. Comm. on Armed Services, Subcomm. on Strategic Forces (Apr. 3, 2014), at 15, App. 625, *unofficial copy available at* http://armedservices.house.gov/index.cfm/2014/4/fiscal-year-2015-national-defense-authorization-budget-request-for-national-security-space-activities ("The incredible success of 68 successful operational EELV missions since 2002 and 99 National Security missions since 1998 came after a string of failures in the late 1990's that caused us to refocus on mission assurance. The cost of a single launch failure, especially one with a multibillion dollar satellite on board, can very quickly overwhelm any savings achieved by aggressive acquisition strategies."). Additionally, the Commanding General, U.S. Air Force Space Command, General William Shelton, recently was reported to comment, "[a]t about $1.5 billion—and sometimes higher—national security payloads have to get there . . . . We're just not going to give up on mission assurance." Irene Klotz, *Shelton Fires Back at SpaceX*, SPACENEWS, Mar. 12, 2014, App. 111, www.spacenews.com/article/military-space/39832shelton-fires-back-at-spacex. General Shelton also stated, "If we lose one of those precious payloads, it takes us a long time to produce a replacement. That creates, normally, a gap in the constellation we're trying to fill." *Id.*, App. 112.

6

Unlike the launch vehicle offered by SpaceX, ULS' Atlas V and Delta IV launch vehicles collectively meet the full range of EELV launch requirements, including the ability to launch all medium, intermediate, and heavy-class payloads into the required orbits. ASD 6, AR 6. These two launch vehicles underwent years of development and rigorous oversight and testing before either launch vehicle was permitted to launch an EELV-class payload, which first occurred in 2002. The Air Force required these launch vehicles to undergo extensive qualification and testing by the Air Force and NRO notwithstanding that these vehicles evolved from launch vehicle families that had flown hundreds of successful launch missions.[6] To date, ULS has achieved 100% mission success for all 72 NSS missions it has launched—an unprecedented string of successes for the U.S. Space Program. ULS has performed six successful launches in 2014 alone, with the most recent occurring on May 22, 2014.[7]

## B.   SpaceX Received Clear Notice of the Air Force's Acquisition Strategy and Sole Source Procurement.

The Government's acquisition strategy, including the planned sole-source contract to ULS for a firm commitment of a minimum quantity buy, was well-publicized and well-known by

---

[6] In contrast, in its Amended Complaint, SpaceX claims that its Falcon 9 launch vehicle (including the legacy version) has launched only nine missions successfully. SpaceX Amended Complaint, ECF Doc. 53, ¶ 39 (Am. Compl.). SpaceX fails to mention, however, that the specific launch vehicle that is subject to the Air Force's certification program covers only the most recent four out of the nine missions referenced by SpaceX. Moreover, SpaceX's claims of success have been publicly questioned. *See* Letter from Mike Rogers, Chairman, Subcomm. on Strategic Forces, Comm. on Armed Services, U.S. House of Representatives, to The Honorable Deborah Lee James, Secretary of the Air Force, and Major General Charles F. Bolden, Jr., NASA Administrator, dated April 29, 2014, App. 113-14 (indicating that an April 18 NASA launch vehicle was short of its desired orbit, and that another SpaceX launch suffered an unexplained anomaly on a 2012 launch resulting in the loss of the CRS-1 secondary Orbcomm payload); *see also* Amy Svitak, *SpaceX Mission Resupplies ISS, Loses OG2 Satellite*, Aviation Week, Oct. 15, 2012, App. 115-18, http://aviationweek.com/awin/spacex-mission-resupplies-iss-loses-og2-satellite.

[7] Press Release, United Launch Alliance, LLC, United Launch Alliance Successfully Launches Four Missions in Just Seven Weeks (May 22, 2014), App. 119-22, *available at* http://www.ulalaunch.com/ula-successfully-launches-NROL33.aspx.

SpaceX. In fact, the Government's strategy of purchasing a large block of launch vehicle cores[8] over multiple years from ULS was discussed publicly in numerous news and trade publications and has been transparent.[9] The public documents referenced in SpaceX's complaint show that the Air Force planned to purchase 40 launch vehicle cores from ULS over a five-year period as far back as 2011. Based on the documents detailed in this section, and the events listed in the Chronology in Support of United Launch Services, LLC's Motion to Dismiss for Lack of Jurisdiction attached hereto as Exhibit A, SpaceX was fully on notice since at least January 2012 that the Air Force was interested in buying 40 launch vehicle cores—a number larger than what was finally included within the awarded contract—on a sole source basis from ULS.

By September 2011, the Government was openly discussing a plan to purchase a "block" of forty EELV cores from ULS, at a rate of eight cores per year over a five-year period commencing with FY 2013. A September 2011 GAO report, referenced in paragraph 43 of SpaceX's Amended Complaint, noted that the Department of Defense ("DoD") was "developing a new EELV acquisition strategy for how it procures launch services and pays for launch

---

[8] Throughout this motion, the term "launch vehicle cores" is used instead of missions or launches because the Delta IV Heavy uses three cores for one mission. All other launch vehicles use one core.

[9] *See, e.g.*, Marc V. Schanz, *Hard Looks at Growing Missions*, AIR FORCE MAGAZINE, Jan. 2012, 22, App. 125, http://www.airforcemag.com/MagazineArchive/Documents/2012/January%202012/0112missions.pdf ("USAF and the National Reconnaissance Office have proposed buying at least eight EELV core boosters a year from Fiscal 2013 to Fiscal 2017."); *see also* Guy Norris, *Challenges Face U.S. Military Launch Ability*, AVIATION WEEK, Jan. 11, 2012, App. 129, http://aviationweek.com/awin/challenges-face-us-military-launch-ability ("Shelton says other cost-savings continue to be developed, including the new block-buy strategy for EELV."); Press Release, U.S. Air Force Space Command, Foundational Space Capabilities Focus of 50th ASM Kick-off (Jan. 11, 2012), App. 131 (discussing "cost-savings initiatives like the command's block-buy strategy for Evolved Expendable Launch Vehicles"); Zach Rosenberg, *IN FOCUS: New Competitors Step Up in EELV Market*, FLIGHT GLOBAL, Nov. 24, 2011, App. 136, http://www.flightglobal.com/news/articles/in-focus-new-competitors-step-up-in-eelv-market-364528/ ("[I]n order to get a handle on costs and reinforce a flagging US industrial base, DoD is changing the way they buy rockets, moving from each rocket individually as needed towards a block-buy system. The new system would commit the government to buying between six and ten ULA rockets per each year for up to five years.").

infrastructure costs."[10] GAO referenced a memorandum of understanding between the Air Force, NRO, and NASA, which indicated that "the new EELV acquisition strategy will most likely commit the Air Force and NRO to buy each year a block of eight launch vehicles—or more specifically eight common booster cores—and commit to doing so for a 5-year period."[11]   Am. Compl. ¶ 43 (citing the 2011 GAO report regarding "the decision for a planned *40-core sole source block buy* from ULA") (emphasis added).

On November 24, 2011, the Air Force executed the "Acquisition Strategy Document for the Evolved Expendable Launch Vehicle (EELV) Program: FY2013-FY2017 Acquisition" (the "ASD"). The ASD addressed projected NSS launch requirements for FY 2013–FY 2019, including a five-year ordering period for launch services through FY 2017 and seven years of launch capability support extending through FY 2019 (the acquisition is currently referenced as "Phase 1," but has been known as "FY BUY" or "FY13 Buy"). *Id.* at 6, 15, AR 6, 15. The strategy included a sole-source contract award to ULS for the Phase 1 period (the EELV "Phase 1 Contract") that would include a baseline core commitment. *Id.* at 17, AR 17 ("Specific wording will be negotiated, but the clause will state that if the baseline core commitment or more is required to launch the manifest listed in the National Launch Forecast between FY15 and FY19, then the government *will order at least the baseline core commitment from [ULS]* to support launch requirements at a minimum annual rate per year.") (emphasis added). New entrants that achieve certification could "compete for EELV-class missions *above the baseline core commitment* and subsequent Phases." *Id.* at 14, AR 14 (emphasis added).

---

[10]   U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-11-641, EVOLVED EXPENDABLE LAUNCH VEHICLE, DOD NEEDS TO ENSURE NEW ACQUISITION STRATEGY IS BASED ON SUFFICIENT INFORMATION 6 (Sept. 2011), App. 146, *available at* http://www.gao.gov/new.items/d11641.pdf.
[11]   *Id.*

The Air Force publicly posted a class J&A applicable to the Phase 1 Contract on January 27, 2012.  Evolved Expendable Launch Vehicle J&A, posted Jan. 27, 2012, AR 46-52.[12]  This J&A document, which stands at the heart of SpaceX's protest, Am. Compl. ¶ 48, provided that the Air Force intended to award contracts to ULS for launches over a six-year period covering FY 2012–FY 2017 and committed the Air Force to procure a block of launch services on a sole-source basis.  The J&A provided in part:

> This class Justification and Authorization (J&A) is to *authorize sole-source award of contracts to United Launch Services, LLC* (ULS) to satisfy EELV-class National Security Space (NSS) launch requirements *from Fiscal Year (FY) 2012 to FY17*. This J&A provides sole-source authority for two acquisitions until a full-and-open competition is feasible.  This includes a contract for FY12 launch services[13] and contract(s) *for FY13-17 launch service requirements*. . . .
>
> Through market research . . . the Government determined no source other than ULS is capable of meeting the SPRD requirements until FY16. It would be an inefficient use of Government resources to hold a competitive source selection before a new entrant (a contractor other than ULS) has fully demonstrated they can meet the SPRD requirements. Based on this, it is expected RFP release can occur no earlier than FY15. As illustrated in the timeline below, *a competitively awarded contract would not occur until FY18*.  This will cause an unacceptable delay in meeting mission requirements identified in FY12–FY17. Therefore, *this J&A must cover the launch service requirement ordering period of FY12 through FY17* to ensure there is no lapse in launch service coverage.

*Id.*, AR 48-49 (emphasis added).  The J&A provided further that the Air Force anticipated "implementing full-and-open competition for the follow-on contract actions for FY 2018–FY

---

[12]   *Available at* https://www.fbo.gov/notices/360c6156488f806bb5235abad7bd9ab9.  For authority, the J&A referenced "10 U.S.C. 2304(c)(1) as implemented by FAR 6.302-1(a)(2)(iii)(B), Only One Responsible Source and No Other Supplies or Services Will Satisfy Agency Requirements due to delays in fulfilling the agency's requirements."

[13]   The J&A authority covered two acquisitions:  (i) FY 2012, and (ii) FY 2013–2017. The acquisition for the FY 2012 launch ordering period was awarded through a modification to a previous EELV launch service contract.

2022 and FY 2023–FY 2030, provided another vendor is certified for EELV-class NSS launches." *Id*, AR 51.

In February 2012, the Department of Defense's ("DoD's") publicly-issued budget submission for FY 2013 provided that the Air Force would be committed to procure a minimum quantity of Atlas V and Delta IV launch services.[14] The budget submission specifically referenced the EELV Acquisition Strategy approved on November 24, 2011, and the commitment to an annual production rate of launch vehicle cores.[15] The submission also provided that DoD was "planning a requirements contract taking advantage of setting a minimum quantity at a steady production rate."[16]

The Air Force's March 23, 2012 RFP for the Phase 1 Contract—to which SpaceX had access, Am. Compl. ¶ 50[17]—shows that the Air Force would procure all the launch vehicle cores detailed within the final contract from ULS and that the Air Force would be obligated to procure the stated quantity of launch vehicle cores from ULS as part of a "Requirements Contract."[18] For example:

- The RFP's transmittal memorandum assumed "a five-year annual ordering period to begin at award anticipated in GFY 2013 through GFY 2017 at a rate of eight (8) LV Cores per GFY as defined in Attachment 1." Transmittal Memo. from Tracy E. Stroud, Contracting Officer, to ULS Contract Manager, Re: EELV Government Fiscal Year (GY) 2013 Phase 1 Buy, Request for Proposal, 1 (Mar. 23, 2012), AR 53 ("RFP Transmittal Memo.").

---

[14] *See* Department of Defense Fiscal Year (FY) 2013 President's Budget Submission, Air Force Justification Book, Vol. 1, Feb. 2012, App. 174-455, *available at* www.saffm.hq.af.mil/shared/media/document/AFD-120207-052.pdf.

[15] *Id.* at 1-217, App. 418.

[16] *Id.* at 1-217, 1-218, App. 418-19.

[17] On April 13, 2012, the Air Force posted the RFP in the New Entrant Data Library for SpaceX and other prospective launch service providers to review. Appendix in Support of Defendant's Motion to Dismiss Portions of Plaintiff's Complaint, ECF Doc. 75-1, Appendix A, Declaration of Tracy E. Stroud, ¶¶ 9-11 (Stroud Decl.); *Id.*, Appendix B, Declaration of Arnold Nowinski ¶¶ 6-7 (Nowinski Decl.).

[18] These Requirements Contract provisions are consistent with FAR 16.503, which describes a "requirements contract" as one in which the Government consideration is a promise to procure all its requirements from that contractor during a specified contract period (from one contractor). FAR 16.503(a).

- The RFP's model contract, Section B, set out Contract Line Item Numbers that included launch vehicle production services covering FY 2013–FY 2017. *Id.* at Attach. 1.e., Model Contract, at Sec. B, Supplies or Services and Prices/Costs, AR 87-94.

- Clause H-0002, entitled "Requirements (MAR 2012)" of the model contract provided: "The requirements, for the purposes of FAR 52.216-21(a), are up to eight (8) Launch Vehicle Cores to support Launch Vehicle Production Services meeting the EELV payload class mass-to-orbit performance capabilities for each Government Fiscal Year (GFY) over the ordering period specified in paragraph a(1) of H-0003, 'Launch Vehicle Production Services Ordering Procedures.'" *Id.* at Sec. H, Special Contract Requirements, AR 106.

- Paragraph a(1) of Clause H-0003 provided: "In accordance with FAR 52.216-18, 'Ordering', the ordering period is approximately five (5) years, to begin at award (anticipated to be GFY13) through the end of GFY17." *Id.*, AR 107-108.

- The model contract also incorporated FAR clause 52.216-21, entitled "Requirements," which provided "[t]his is a ***requirements contract for the supplies or services specified, and effective for the period stated, in the Schedule***." FAR clause 52.216-21(a) (emphasis added).

- Paragraph (c) of the FAR Requirements clause established the scope of the Government's obligation and contract consideration: "Except as this contract otherwise provides, the Government shall order from the Contractor ***all the supplies or services specified in the Schedule that are required to be purchased*** by the Government activity or activities specified in the Schedule." *Id.* ¶ (c) (emphasis added).

On November 27, 2012, Under Secretary of Defense Frank Kendall issued an Acquisition Decision Memorandum revising the January 2012 J&A to decrease the quantity of launch vehicle cores committed to ULS from 40 to 36 and to allow competition for additional missions if competition is viable. Am. Compl. ¶ 51; Memorandum from Frank Kendall, Under Secretary of Defense, Acquisition, Technology and Logistics to the Secretary of the Air Force, Director, Cost Assessment and Program Evaluation regarding Evolved Expendable Launch Vehicle Program Quantity Buy Decision Acquisition Decision Memorandum (Nov. 27, 2012), AR 280-81 (the "ADM"). The ADM "authorize[d] the Air Force to negotiate with United Launch Alliance (ULA) based on an acquisition strategy that plans to procure up to *36 EELV cores across 5 years* (FY 2013–FY 2017) from ULA and up to an *additional* 14 cores from ULA under

12

the Variation in Quantity and configuration provisions if competition is not viable at time of need." *Id.* at 1, AR 280 (emphasis added). The ADM indicated that these ***additional*** cores (up to 14) would be "available for competition if emerging new entrants have the required launch capability on a schedule to support all or some of these launches." *Id* at 2, AR 281.[19]

On June 26, 2013, the Air Force awarded a letter contract to ULS, Contract No. FA8811-13-C-0003, AR 297-324, which was publicly announced on Defense.gov and posted to the Federal Procurement Data System.[20] The contract obligated the Government to order 35 launch vehicle cores from ULS from FY 2013–FY 2017 if requirements exist and funds are appropriated.[21] The Contract also incorporated FAR clause 52.216-21, "Requirements," and ordered seven cores for FY 2013.

On December 18, 2013, the Air Force and ULS agreed to a contract modification that definitized the contract. The modification included firm-fixed pricing for the duration of the launch vehicle production services ordering period, FY 2013–FY 2017, and included an order for seven (7) launch vehicle cores for FY 2014. On December 19, 2013, a notice of the contract action, entitled, "Contract Notice: EELV FY13–17 Launch Vehicle Production Services and annual options for associated Launch Capability FY 15–19," was posted on FedBizOpps.[22]

---

[19] In its Amended Complaint, SpaceX claims that the Air Force made a commitment to compete 14 launches as soon as a new entrant became certified. Am. Compl. ¶ 54. The ADM, however, specifically indicated that up to 14 launch vehicle cores ***above the baseline commitment*** awarded to ULS could be competed if a new entrant obtained the required capability.

[20] Press Release, U.S. Department of Defense, Contracts for June 26, 2013–Air Force, App. 456-57, *available at* http://www.defense.gov/contracts/contract.aspx?contractid=5073.

[21] Although the J&A authorized the purchase of 36 cores from ULS, one of the cores was purchased under a pre-existing launch services contract between ULS and the Air Force.

[22] U.S. Air Force Award Notice, FA8811-13-C-0003-PZ0001, App. 458-60, *available at* https://www.fbo.gov/spg/USAF/AFSC/SMCSMSC/Awards/FA8811-13-C-0003-PZ0001.html.

C.    **Air Force Criteria for Launch Services and SpaceX Capability.**

The Air Force specifically designed its acquisition strategy to assist potential new

entrants, such as SpaceX, to become competitive.  In fact, the Air Force has gone to great lengths

to accommodate SpaceX and help develop its capabilities, including the award of two low-risk

launch missions under the OSP-3 launch program to SpaceX without competition from ULS, and

the expenditure of tens of millions of dollars to assist SpaceX in its certification efforts.  The two

low-risk, yet-to-be-launched missions that the Air Force awarded SpaceX, and which SpaceX

references in its Amended Complaint, are the direct result of this strategy to assist new entrants.

Am. Compl. ¶ 41 ("Indeed, the Air Force itself has ordered two launches from SpaceX for the

carriage of national security payloads.").[23]

To support increased competition, on October 27, 2011, the Air Force published its "New

Entrant Certification Guide," which details the certification process for all new entrants to be

eligible to receive contracts for launch services.  Am. Compl. ¶ 59; U.S. Air Force, United States

Air Force Launch Services New Entrant Certification Guide ("NECG") (Oct. 27, 2012), App.

471-540.  The Guide provides that the Air Force certification process assists "in determining the

capability of prospective contractors in accordance with Federal Acquisition Regulation (FAR)

9.1 ('Responsible Prospective Contractors')."  *Id.* at 2, App. 486.[24]  The Guide sets out each

---

[23]    *See also* Press Release, Space Exploration Technologies Corp., SpaceX Awarded Two EELV-Class
Missions from the United States Air Force (Dec. 5, 2012), App. 461, *available at*
www.spacex.com/press/2012/12/19/spacex-awarded-two-eelv-class-missions-united-states-air-force.    In
addition to awarding these two launches without competition from ULS, SpaceX has benefited from Air Force
expenditures that are reportedly in excess of $60 million in order to assist SpaceX achieve certification.
SpaceX Reponses to Questions for the Record Posed by United Launch Alliance, National Security Space
Launch Program, Hearing Before the S. Comm. on Appropriations, Defense Subcomm. (April 9, 2014), App.
466-67, *unofficial copy available at* http://www.spacenewsinc.com/pdf/ULAtoSpaceXquestions
andresponses.pdf; *see also* Tony Capaccio, *Air Force Spending $60 Million for SpaceX U.S. Launches*,
Bloomberg, May 15, 2014, App. 468-70, http://www.bloomberg.com/news/2014-05-15/u-s-air-force-busting-
butt-to-certify-musk-s-spacex.html.
[24]    FAR Subpart 9.1 "prescribes policies, standards, and procedures for determining whether prospective
contractors and subcontractors are responsible." FAR 9.100.

standard or specification the New Entrant must meet, the documents or data the New Entrant must provide, and the evaluation process that the Air Force will employ in assessing the criterion. NECG at 2, App. 486. Additionally, the Guide details the listed flight experience requirements depending on NSS mission classification. *Id.* at 5-7, App. 489-91.

SpaceX was not eligible to compete and could not have performed the required scope of work in 2012 when the Air Force released the RFP and when proposals were due.[25] When the Air Force released its RFP in March 2012, SpaceX had just initiated the certification process and, as of the time the Air Force and ULS signed the Phase 1 Contract, the Falcon 9 v.1.1 had not flown the first of the requisite launch missions.[26] Additionally, as recently as March 2014, SpaceX's Elon Musk represented to Congress that SpaceX could only support a portion of the EELV launch missions that are within the scope of the Phase 1 Contract.[27] This establishes that SpaceX could not have submitted a compliant proposal for the total requirements solicited on March 23, 2012 and included in the resulting contract.

When the Air Force released the J&A and RFP, through to contract award, the Air Force could not have known with any certainty whether SpaceX would be able to complete the minimum number of flights required for certification. SpaceX has been saying for years that it

---

[25] The RFP required ULS to submit its proposal to the Air Force within ninety (90) days for core launch vehicle production services. RFP Transmittal Memo., AR 53.

[26] Press Release, U.S. Air Force, SpaceX Launch Counts Towards EELV Certification (Feb. 25, 2014), App. 541, *available at* http://www.losangeles.af.mil/news/story.asp?id=123401533 (documenting September 2013 launch as the only one accepted by Air Force for SpaceX certification).

[27] Specifically, Musk estimated SpaceX could support "approximately 60 percent" of the Phase 1 missions. On March 5, 2014, SpaceX CEO and Chief Designer Elon Musk and ULS CEO Michael Gass both spoke at a National Security Space Launch program hearing held before the Senate Appropriations Committee's Defense Subcommittee. At the hearing's close, Musk and Gass agreed to submit additional questions to each other, the written answers to which would be submitted for the congressional record. In response to ULS' question of whether or not SpaceX could support the original requirements of the EELV Systems specification, Musk replied, "SpaceX today can support **approximately 60 percent** of the EELV launches planned through 2019." SpaceX Reponses to Questions for the Record Posed by United Launch Alliance, National Security Space Launch Program, Hearing Before the S. Comm. on Appropriations, Defense Subcomm. (April 9, 2014), App. 464, *unofficial copy available at* http://www.spacenewsinc.com/pdf/ULAtoSpaceXquestionsandresponses.pdf (emphasis added).

15

will be ready to compete soon in the EELV arena. For example, in its prior bid protest before this Court, SpaceX stated that it anticipated having "full EELV launch capability by 2007." *Space Exploration Techs. Corp. v. United States*, 68 Fed. Cl. 1, 4 (2005) (case dismissed for lack of standing because SpaceX "failed to file an action with the court until after the date for submission of proposals had passed" and because SpaceX lacked full launch capability prior to FY 2007). Among other things, SpaceX claimed that a properly structured J&A for the EELV program would "recognize SpaceX as a competitive bidder in 2007." *Id.* at 8. SpaceX also claimed that it had a contract with a government agency for an EELV-class vehicle in 2007. *Id.* at 6. Notwithstanding SpaceX's statements during the prior bid protest, SpaceX was not certified in 2007, is still not certified today, and had its first EELV-class launch only recently.

### D. SpaceX's Current Amended Complaint.

As with its prior protest, SpaceX again waited to protest until long after the date set for proposal submission. The Amended Complaint does not claim that SpaceX was an actual or qualified bidder during the acquisition process or at the time of contract award in June 2013. In fact, SpaceX concedes that even now its launch vehicle cannot accomplish the full range of launch services required by the contract. Am. Compl. ¶ 36 ("The Falcon 9, a two-stage launch vehicle, has been designed such that it can carry a large portion of the EELV program's missions.").[28]

---

[28] *See also* SpaceX Reponses to Questions for the Record Posed by United Launch Alliance, National Security Space Launch Program, Hearing Before the S. Comm. on Appropriations, Defense Subcomm. (April 9, 2014), App. 464, *unofficial copy available at* http://www.spacenewsinc.com/pdf/ULAtoSpaceXquestionsand responses.pdf.

# ARGUMENT

**I.    This Court Lacks Jurisdiction to Entertain SpaceX's Complaint Because SpaceX Lacks Standing.**

"[S]tanding is a threshold jurisdictional issue." *Myers Investigative and Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-04 (1998)).  SpaceX, as the party seeking jurisdiction, "bears the burden of establishing [the] elements [of standing]."  *Myers*, 275 F.3d at 1369 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  A "lack of standing precludes a ruling on the merits."  *Media Techs. Licensing, LLC v. Upper Deck Co.*, 334 F.3d 1366, 1370 (Fed. Cir. 2003).  Where, as here, the party moving for dismissal under RCFC 12(b)(1) challenges the jurisdictional facts asserted within a complaint, the court may consider relevant evidence outside the complaint to resolve the dispute.  *Rogers v. United States*, 95 Fed. Cl. 514, 515 (2010) (citing *Moyer v. United States*, 190 F.3d 1314, 1318 (Fed. Cir. 1999)).[29]

Under the Tucker Act, the Court of Federal Claims has jurisdiction to adjudicate "an action by an ***interested party*** objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1) (emphasis added).  The term "interested party" is not defined by statute, but has been interpreted by the Federal Circuit as having the same meaning as set forth in the Competition in Contracting Act ("CICA").  31 U.S.C. § 3551(2)(A); *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001).  As such, "standing under § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract."  *Myers*, 275 F.3d at

---

[29] *See also supra* note 4.

1370 (quotation omitted); *see also Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006). Accordingly, in order to establish standing, the party must "show that it is 1) an actual or prospective bidder and 2) that it has a direct economic interest." *Digitalis Educ. Solutions, Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012).

This Court lacks jurisdiction over SpaceX's complaint because (1) SpaceX does not qualify as an actual or prospective bidder; and (2) SpaceX does not have a direct economic interest in the EELV Phase 1 Contract. Because SpaceX cannot satisfy either prong of the Federal Circuit's two-prong test for interested party status,[30] its Amended Complaint must be dismissed for lack of jurisdiction.

### A. SpaceX Lacks Standing Because It Is Not an Actual or Prospective Bidder for the EELV Phase 1 Contract.

SpaceX lacks standing because it was neither an actual nor prospective bidder for the EELV Phase 1 Contract awarded to ULS. The Federal Circuit has held that "the opportunity to qualify either as an actual or a prospective bidder ends when the proposal period ends." *Rex Serv. Corp.*, 448 F.3d at 1308 (quoting *MCI Telecomm. Corp. v. United States*, 878 F.2d 362, 365 (Fed. Cir. 1989)). As a matter of law, a party that does not submit a proposal or file a protest before the deadline for proposal submission is not an actual or prospective bidder and, therefore, is not an interested party for the purpose of this Court's jurisdiction. *Rex Serv. Corp.*, 448 F.3d at 1307-08; *see also Fed. Data Corp. v. United States*, 911 F.2d 699, 704-705 (Fed. Cir. 1990) (affirming dismissal and noting that plaintiff failed to timely utilize "the protest procedures available to an interested party to correct any deficiencies it perceived in the procurement process").

---

[30] In alleging standing, SpaceX solely addresses the second prong of the Federal Circuit's test for interested party status. *See* Am. Compl. ¶ 20. It does not allege that it was an actual or prospective bidder for the EELV Phase 1 Contract.

Here, SpaceX did not submit a proposal and did not file a bid protest in response to (1) the November 2011 Acquisition Strategy Document; (2) the January 27, 2012 J&A for the EELV Phase 1 Contract award to ULS; or (3) the March 23, 2012 RFP for a sole-source requirements contract for EELV launch services and EELV launch capability through FY 2019 (with launch cores to be ordered through FY 2017). Although SpaceX claims that it was "kept in the dark" regarding the Air Force's acquisition strategy, Hr'g Tr. 35:16-23, April 30, 2014, App. 576, the publicly available documents that SpaceX itself referenced in its Amended Complaint confirm that SpaceX was well aware of the Government's acquisition strategy, but failed to submit a proposal or file a timely bid protest. As such, SpaceX is not an interested party for purposes of subject matter jurisdiction.

In *MCI Telecommunications*, the Federal Circuit considered "whether a would-be-protester wishing to bring about a solicitation on which it says it intends to bid has the necessary status [as an interested party], even though it failed to either bid in response to the original solicitation or to protest before the close of the proposal period for the original solicitation." 878 F.2d at 364. The Federal Circuit rejected the protester's contention that an alleged procurement error would result in a resolicitation that established the protester as an interested party. The court ruled:

> Since the opportunity to qualify either as an actual or a prospective bidder ends when the proposal period ends, MCI's stated intention to submit a proposal in response to any resolicitation, and its efforts to secure resolicitation by filing a protest, can do nothing to create the necessary interested party status. By the close of the proposal period, MCI had placed itself outside the boundaries of interested party status. That is where it must remain . . . . Nothing later proven could alter the fact that MCI did not act on time to become an interested party with regard to the solicitation; since, at this point, that is the only solicitation that ever was, nothing alters the fact that MCI was not an actual or prospective bidder and, therefore, is not an interested party.

Case 1:14-cv-00354-SGB   Document 76   *SEALED*   Filed 07/02/14   Page 25 of 35

*Id.* at 365.

*MCI Telecommunications* demonstrates that SpaceX's argument that it is now an interested party because it "could compete for the contract" if the procurement was reopened for competition, Am. Compl. ¶¶ 20-21, is insufficient to establish SpaceX as an actual or prospective bidder for purposes of standing. Nor can SpaceX manufacture standing by referencing alleged facts and events that occurred after June 2012, which is subsequent to the J&A and RFP.[31] "Nothing later proven can alter the fact that [SpaceX] did not act in time to become an interested party." *MCI Telecomm.*, 878 F.2d at 365.

In *Rex Service*, the Federal Circuit considered whether a protester that filed an agency-level bid protest prior to the close of bidding, but did not submit a bid, had standing as an interested party to file a bid protest at this Court. The court ruled it did not:

> It is not relevant to Rex's status that it filed a pre-award agency protest, or that it alleges department "illegalities" prejudiced its ability to bid. It "could have [bid] for the contract award . . . and could have utilized the protest procedures available to an interested party to correct [the] deficiencies it perceived in the procurement process." Similarly, we reject Rex's argument that it was a prospective bidder because it was a named source for "thumbwheel switches" and supplied the department with those parts under other contracts. This may have influenced its business decision not to submit a bid, but cannot overcome the failure to meet the prospective bidder requirements of *MCI*. In the end, ***Rex did not submit a bid; nor did it file a timely bid protest in the Court of Federal Claims, in which it established that it expected to bid prior to the close of the solicitation period, but was prevented from doing so on the basis of improper agency action.***

448 F.3d at 1308 (emphasis added) (internal citations omitted).

---

[31] SpaceX claims that it "undoubtedly could compete for Single Core Launch Vehicles if the Air Force were to procure them through full and open competition." Am. Compl. ¶ 21. SpaceX further claims that it is *now* "a proven provider of launch services for both U.S. Government and commercial customers" and received two launches from the Air Force. *Id.* As demonstrated by *MCI Telecommunications* and the other decisions discussed in this section, SpaceX's claims of recent success have no bearing whatsoever on whether SpaceX qualified as an actual or prospective bidder prior to the close of the EELV Phase 1 RFP.

SpaceX's claim of standing is even weaker than the protester's claim of standing in *Rex Service*. SpaceX filed no protest despite being on notice of the Government's acquisition strategy as far back as November 2011, when the Government issued an acquisition strategy covering a baseline commitment to procure launch services for NSS missions for the FY 2013–FY 2017 ordering period. ASD at 15, 17, AR 15, 17.

Additionally, SpaceX did not protest the January 2012 J&A, notwithstanding that the J&A notice expressly covered EELV launch service requirements that SpaceX only now claims, more than two years later, should have been competed. *See Digitalis*, 664 F.3d at 1384 (analogizing a notice of intent to issue a sole-source award to a solicitation and ruling that the protester's failure to submit a response rendered the protester other than an actual or prospective bidder).

Similarly, SpaceX did not submit a response and did not protest the EELV Phase 1 RFP prior to the expiration of the RFP's response period.[32] This failure deprives SpaceX of standing to file this bid protest. *See Infrastructure Def. Techs., LLC v. United States*, 81 Fed. Cl. 375, 387 (2008) (in reviewing a protest of a sole-source procurement, this Court ruled that "[a]bsent a proposal, [the protester] failed to establish standing to protest"); *see also Reilly v. United States*, 104 Fed. Cl. 69, 79 (2012) ("In the case of a bid protest, in particular, this Court has explained

---

[32] SpaceX was provided access to the RFP and, therefore, was on notice that the EELV Phase 1 RFP called for a sole-source requirements contract covering launch cores to be ordered through FY 2017 and launch capability services through FY 2019. Stroud Decl. ¶¶ 9-11; Nowinski Decl. ¶¶ 6-7. Even if SpaceX did not have access to the RFP, it still would not qualify as an actual or prospective bidder because it neither responded to the J&A nor sought clarification as to the requirements being solicited from ULS on a sole-source basis. SpaceX may not sit on its rights while being on notice of the Air Force's acquisition strategy to only now claim ignorance more than two years later. *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007) (contractors have a duty to seek clarification from the Government where a solicitation contains a patent ambiguity); *see also Logistics Solutions Group, Inc.*, B-294604.7, 2005 CPD ¶ 141 at 4-5 (protest of sole-source bridge contract untimely where protester learned about award seven months before the contracting officer confirmed the sole-source contract, prompting the protester to file at GAO; "this delay simply does not meet our requirements for the expeditious pursuit of information.").

that a plaintiff cannot sit on his rights while allowing the Government to move forward on a contract") (citing *Benchmade Knife Co., Inc. v. United States*, 79 Fed. Cl. 731, 737 (2007)).

Accordingly, because SpaceX was neither an actual nor prospective offeror for the EELV Phase 1 Contract, this Court lacks jurisdiction over SpaceX's complaint.

**B.      SpaceX Lacks a Direct Economic Interest in the Phase 1 EELV Contract.**

Even if SpaceX could establish that it was an actual or prospective bidder prior to the close of the EELV Phase 1 RFP—which it cannot—it nonetheless cannot satisfy the second prong of the definition of an interested party, which requires that SpaceX demonstrate a direct economic interest in the EELV Phase 1 Contract.

"To prove a direct economic interest as a putative prospective bidder, [the protester] is required to establish that it had a 'substantial chance' of receiving the contract." *Rex Serv. Corp.*, 448 F.3d at 1308 (citing *Myers*, 275 F.3d at 1370). To prove it had a "substantial chance," a protesting party is required to "establish not only some significant error in the procurement process, but also that there was a substantial chance it would have received the contract award but for that error." *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996); *see also COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1383-84 (Fed. Cir. 2012) (protester that did not meet the solicitation's technical requirements lacked standing because it could not establish that it had a substantial chance of securing the award absent the alleged errors).

In the context of sole-source awards, the Federal Circuit has held that where the agency has awarded a sole-source contract on grounds that there was only one responsible source, a protester must show that it would have been a qualified bidder had it been allowed to bid and that it had a substantial chance of receiving the award. For example, in *Digitalis,* the Federal Circuit

held that a five day response period for submission of statement of capabilities—much less than the three months afforded to SpaceX—was a sufficient amount of time for the protester to respond. Since the protester chose not to do so, it lost any ability to claim a direct economic interest it may have held in the procurement. *Digitalis,* 664 F.3d at 1385; *see also Myers,* 275 F.3d at 1370-71 (finding that the protester lacked standing to challenge a sole-source award because it was not a responsible bidder and therefore would not have had a substantial chance of receiving the award); *IHS Global Inc. v. United States,* 106 Fed. Cl. 734, 746-47 (2012) (holding, in a challenge to a sole-source procurement, that protester lacked a direct economic interest as it did not possess a tool capable of meeting the agency's technical requirements).

In *Myers,* the protester requested that the court invalidate two sole-source contracts and order the agency to procure the contracts on a competitive basis. *Myers,* 275 F.3d at 1368. The protester asserted that it would have submitted proposals had the agency conducted the procurements on a competitive basis. *Id.* The Federal Circuit rejected the protester's arguments on standing, holding that "[t]he mere fact that it might have submitted a bid in a competitive procurement is not sufficient." *Id.* at 1370. Instead, the protester was required to demonstrate that it would have had a substantial chance of receiving the award and otherwise was a qualified bidder. *Id.*

Here, SpaceX has not alleged, nor could it truthfully do so, that it satisfied all the criteria for new EELV entrants[33] during the solicitation period, or at any time prior to contract award in June 2013. In fact, SpaceX's launch vehicle did not perform its first EELV-class flight until

---

[33]   Additionally, SpaceX has not alleged that the new entrant criteria were or is unduly restrictive of competition and has had a copy of the New Entrant Certification Guide since around December 2011.

September 2013, three months subsequent to the EELV Phase 1 contract being signed.[34] SpaceX's Amended Complaint contains no allegation or argument that the Air Force's requirements for EELV certification are arbitrary and capricious.

Even under SpaceX's strained interpretation that it recently has become a "qualified bidder" having submitted another round of unsubstantiated flight data to the Air Force on March 22, 2014, Am. Compl. ¶ 61, SpaceX fails to acknowledge that its submission of that data was nearly 21 months after the RFP's closing date, approximately eight months after the Air Force entered into the EELV Phase 1 Contract, and more than four months after the Air Force executed a contract modification to definitize that contract. Any alleged subsequent "qualification" would not provide SpaceX with standing to protest a solicitation that has since expired. *MCI Telecommunications*, 878 F.2d at 365 (holding that "[s]ince the opportunity to qualify either as an actual or a prospective bidder ends when the proposal period ends, [the protester's] stated intention to submit a proposal in response to any resolicitation, and its efforts to secure resolicitation by filing a protest, can do nothing to create the necessary interested party status . . . . [Therefore] it was unnecessary and inappropriate for the board to determine the likelihood that [the protester's] charges would result in a resolicitation of the contract.").[35]

SpaceX does not claim even now that it can perform—and has admitted that it cannot perform—all the launch services needed to fulfill all the Government requirements in the RFP and Phase 1 Contract.[36]

---

[34] Press Release, U.S. Air Force, SpaceX Launch Counts Towards EELV Certification (Feb. 25, 2014), App. 541, *available at* http://www.losangeles.af.mil/news/story.asp?id=123401533 (documenting September 2013 launch as the only one accepted by Air Force for SpaceX certification).

[35] Similarly, in *Federal Data*, the Court, citing *MCI Telecommunications*, expressly declined to consider the protester's "stated desire to compete in a later solicitation." 911 F.2d at 704.

[36] SpaceX Responses to Questions for the Record Posed by United Launch Alliance, National Security Space Launch Program, Hearing Before the S. Comm. on Appropriations, Defense Subcommittee (April 9, 2014),

Case 1:14-cv-00354-SGB   Document 76  *SEALED*   Filed 07/02/14   Page 30 of 35

Consequently, SpaceX was not a certified, qualified, or responsible offeror at the time of solicitation or contract award, and it otherwise lacked a substantial chance of receiving the award. *See* U.S. Air Force, United States Air Force Launch Services New Entrant Certification Guide, at 2 (Oct. 27, 2012), App. 486 (stating that the New Entrant Certification Guide was intended to aid the Air Force in determining the capability of prospective contractors for purposes of FAR Subpart 9.1 responsibility determinations); Evolved Expendable Launch Vehicle J&A, publicly posted Jan. 27, 2012, AR 46-52[37] (providing that "the Government determined no source other than ULS is capable of meeting the SPRD requirements until FY16" and, therefore, "[i]t would be an inefficient use of Government resources to hold a competitive source selection before a new entrant (a contractor other than ULS) has fully demonstrated they can meet the SPRD requirements.").

In its attempt to allege standing in its Amended Complaint, SpaceX does not argue that it qualifies as an actual or prospective bidder for the EELV Phase 1 Contract; instead, SpaceX focuses solely on the second prong of the interested party test. Specifically, SpaceX references *Defense Technology, Inc. v. United States*, for the premise that a plaintiff need only establish it could compete for the contract if it were made competitive in order to show an improper sole-source award. Am. Compl. ¶ 20, citing *Def. Tech., Inc. v. United States*, 99 Fed. Cl. 103, 115 (2011) (citing *Myers*, 275 F.3d at 1370). SpaceX's selective quotation, however, omits a significant portion of the relevant discussion from *Myers*, specifically the court's ruling that "[t]he mere fact that [the protester] might have submitted a bid in a competitive procurement is not sufficient" and that it must establish that it would have had a substantial chance of receiving

---

App. 464, *unofficial copy available at* http://www.spacenewsinc.com/pdf/ ULAtoSpaceXquestionsandresponses.pdf.

[37] *Available at* https://www.fbo.gov/notices/360c6156488f806bb5235abad7bd9ab9.

the award and was a qualified bidder. 275 F.3d at 1370-71. SpaceX satisfies none of these criteria.

SpaceX's reference to *Distributed Solutions, Inc. v. United States* is similarly unavailing. Am. Compl. ¶ 20, citing *Distributed Solutions, Inc. v. United States*, 104 Fed. Cl. 368, 380 (Fed. Cl. 2012). In *Distributed Solutions,* protesters were prospective bidders because they submitted qualifying proposals, were prepared to submit bids, and possessed a direct economic interest in the procurement, therefore the "wrongful[] depriv[ation]" of the opportunity to compete was sufficient to establish prejudice. *Id.* In contrast, SpaceX submitted no proposal, had no bid prepared, and cannot point to any cognizable injury.

Therefore, SpaceX lacks the requisite "direct economic interest" required for standing with respect to the EELV Phase 1 Contract awarded to ULS and has no grounds upon which to establish that it is an interested party that was deprived of the opportunity to compete. *See Infrastructure Def. Techs.*, 81 Fed. Cl. at 388 (holding that protester failed to demonstrate the required economic interest in a sole-source procurement where it failed to establish that it could have provided the materials solicited); *see also H.G. Prop. A, L.P. v. United States*, 68 Fed. App'x 192, 194-95 (Fed. Cir. 2003) (dismissing protester's complaint that the agency violated CICA by not re-bidding a modified contract, finding that protester had not established a substantial chance of receiving the award); *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1088 (Fed. Cir. 2001) (finding no violation of procurement procedure when awarding a sole-source contract where the protester did not possess the requisite qualifications to establish a substantial chance of receiving the award).

## II. SpaceX's Failure to Timely File Its Protest Waived Any Right to Challenge the EELV Phase 1 Contract and Overall Acquisition Strategy.

Protesters that fail to timely contest alleged flaws apparent on the face of solicitations, and notices of intent to issue sole-source awards, waive any right to protest those alleged flaws before this Court. *Blue & Gold Fleet*, 492 F.3d at 1313; *Infrastructure Def. Techs.*, 81 Fed. Cl. at 388-89. The waiver rule stems from this Court's jurisdictional statute, which requires the Court to "give due regard to the interests of national defense and national security and the need for expeditious resolution of the action." 28 U.S.C. § 1491(b)(3); *Blue & Gold Fleet*, 492 F.3d at 1313 (citing Section 1491(b)(3) as the jurisdictional basis for the waiver rule).

In *Blue & Gold Fleet*, the protester filed a bid protest arguing, in part, that the winning proposal did not include employee wage and benefit information as required by the Service Contact Act and, therefore, should not have been considered financially viable for award. 492 F.3d at 1312. The Court of Federal Claims ruled, and the Federal Circuit affirmed, that the protester's claim was properly characterized as a challenge to the terms of the solicitation because it was apparent from the solicitation that it omitted a requirement to provide Service Contract Act compliance data. *Id.* at 1313. The court determined that the protester "missed its chance to protest" because it did not raise the challenge prior to proposal submission. *Id.* at 1312. The court held that "[a] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." *Id.* at 1313.

The Federal Circuit referenced this Court's jurisdictional grant under 28 U.S.C. § 1491(b), requiring that the Court give "due regard to the interests of national defense and national security and the need for expeditious resolution of the action," and acknowledged that

27

application of the waiver rule supported this statutory mandate. *Id.* at 1313 (quoting 28 U.S.C. § 1491(b)(3)). The Federal Circuit noted that the waiver rule "prevents contractors from taking advantage of the government and other bidders, and avoids costly after-the-fact litigation." *Id.* at 1314.

This Court has subsequently applied *Blue & Gold Fleet* to challenges of sole-source procurements. In *Infrastructure Defense Technologies*, the agency issued a pre-solicitation notice of its intent to issue a sole-source request for proposal and subsequently published its justification for the proposed sole-source contract. 81 Fed. Cl. at 380-81. Just like SpaceX, the *Infrastructure Defense* protester was on notice of these published notices, but failed to file a pre-award bid protest. *Id.* at 385-86. This Court held that since the protester failed to act on either the solicitation or the J&A document until after a contract award was made, it waived its right to protest the terms of those notices providing for a sole-source award. *Id.* at 389. The fact that the *Infrastructure* protester failed to bid made "the case of waiver even stronger" than in the *Blue & Gold Fleet* case, where the protester had submitted a bid. *Id.*

Similarly, in *International Management Services, Inc. v. United States*, a protester waived its right to maintain a post-award protest challenging an agency's small business set-aside procurement, as the remedy sought—full and open competition—would require amendment to the solicitation. 80 Fed. Cl. 1, 8-9 (2007) ("[D]espite its assertion to the contrary . . . plaintiff is not attacking the Army's evaluation of the proposals, but the terms of the solicitation itself."); *see also Benchmade Knife Co. v. United States*, 79 Fed. Cl. 731, 737 (2007) (finding protest untimely where it was "undisputed that Benchmade knew the solicitation was unrestricted [by small-business set-aside], and yet, waited until after contract award . . . before filing a protest").[38]

---

[38] *See Managed Care Concepts*, LLC, B-402750, 2010 CPD ¶ 164 at 2 n.2 (post-award protest of diversion of work from RFP subject to competition to sole source contract untimely where protester was on notice of the

SpaceX was well aware of the Air Force's acquisition strategy throughout the procurement, had access to a publicly posted J&A for the sole-source acquisition, and SpaceX received access to the EELV Phase 1 RFP. SpaceX nevertheless elected not to file its protest until nearly 30 months after the Air Force announced its acquisition strategy in November 2011, until more than two years after the Air Force's publication of the J&A in January 2012, and until approximately 22 months from the solicitation's closing in June 2012. In doing so, SpaceX waived any right it may have had to protest and its protest is untimely under *Blue & Gold Fleet*. *Blue & Gold Fleet*, 492 F.3d at 1313 (holding that the waiver rule advances the statutory mandate that "the courts shall give due regard to the interests of national defense and national security and *the need for expeditious resolution of the action*") (emphasis in original). This is especially so considering the significant national defense and national security subject matter of SpaceX's bid protest. 28 U.S.C. § 1491(b)(3).

Accordingly, this Court lacks subject matter jurisdiction over SpaceX's complaint because SpaceX waived any right to maintain this action by failing to file a timely bid protest.

## CONCLUSION

ULS respectfully requests this Court to dismiss SpaceX's Amended Complaint in its entirety, with prejudice, pursuant to RCFC 12(b)(1) and 28 U.S.C. § 1491(b)(1). Specifically, SpaceX lacks standing as an "interested party" to contest the terms of the sole-source contract

---

sole source award several weeks before the diversion of work allegedly subject to competition occurred); *Logistics Solutions Group, Inc.*, B-294604.7, 2005 CPD ¶ 141 at 4-5 (protest of sole-source bridge contract untimely where protester learned about award seven months before the contracting officer confirmed the sole-source contract, prompting the protester to file at GAO; "this delay simply does not meet our requirements for the expeditious pursuit of information"); *cf. Sun Dial and Panel Corp.*, B-277660, 97-2 CPD ¶ 146 at 4 (protest challenging fact that agency created urgency for sole-source award "by wasting months of time" untimely where J&A cited urgent and compelling circumstances as rationale for award and protester first made argument in brief on the merits). The Comptroller General has issued regulations requiring alleged defects in solicitations to be protested before proposals are due to the agency, a similar rule to that in *Blue & Gold Fleet*. 4 C.F.R. § 21.2(a)(1). Therefore, ULS submits that these GAO opinions are highly persuasive.

awarded to ULS because SpaceX is neither an "actual or prospective" bidder and it otherwise lacks a direct economic interest in the contract.   Moreover, SpaceX's protest is not timely, waiving any right to protest the Air Force's acquisition strategy and terms of the sole-source contract, pursuant to *Blue and Gold Fleet* and subsequent decisions.

Dated:  July 1, 2014                                    Respectfully submitted,


OF COUNSEL:

Thomas L. McGovern, III                  /s/ Michael F. Mason
C. Peter Dungan                          Michael F. Mason
HOGAN LOVELLS US LLP                     HOGAN LOVELLS US LLP
                                         555 13th Street, NW
Jason A. Carey                           Washington, D.C. 20004
MCKENNA LONG & ALDRIDGE LLP              (202) 637-5499 - Phone
                                         (202) 637-5910 - Fax
                                         mike.mason@hoganlovells.com